[No. 16996. Department One. December 6, 1922.]

PACIFIC COAST COAL COMPANY, *Appellant,* v. DISTRICT No. 10, UNITED MINE WORKERS OF AMERICA *et al.,* *Respondents.*[1]

APPEAL (353)—DISMISSAL—RIGHT TO DISMISS—PARTY NOT INTERESTED. An appeal from an order denying a temporary injunction against picketing by labor unions will be dismissed, as to one of the individuals joined as defendants, where it is not controverted that he was not a member of the unions and had not done any of the acts complained of.

SAME (353)—DISMISSAL—ERROR NOT ASSIGNED. Failure to assign error as to an individual defendant joined is a confession by appellant entitling such party to a dismissal of the appeal as to him.

SAME (172)—PREMATURE APPEAL—NOTICE PENDING MOTION FOR NEW TRIAL. Plaintiff's oral notice of appeal from an order denying a temporary injunction, given in open court at the time, is not premature because the defendants had interposed a timely motion for a new trial on the question of insufficiency; since the motion was not necessary to review the questions and did not prevent the judgment from being final.

SAME (66)—DECISIONS REVIEWABLE—INJUNCTION—FINDING OF INSOLVENCY. Under Rem. Comp. Stat., § 1716, an order denying a temporary injunction is appealable where the court upon the hearing found the insolvency of the party against whom the injunction stood; and such finding of insolvency cannot be questioned to affect the appellate jurisdiction.

[1]Reported in 210 Pac. 953.

SAME (240)—SUPERSEDEAS—INJUNCTION. In a suit for an injunction an appeal and supersedeas from the denial of a temporary injunction has the effect of keeping the temporary restraining order in force.

TRADE UNIONS (1)—RIGHTS AND LIABILITIES OF MEMBERS. Rem. Comp. Stat., §§ 7611-7613, legalizing labor unions, expressly permits injunctions against them when necessary to prevent irreparable damage to property or personal rights, where there is no adequate remedy at law.

INJUNCTION (53, 54)—ACTIONS FOR—DISMISSAL BEFORE HEARING—TRIAL OR HEARING. In an action against labor unions for an injunction against picketing, the court should require defendants to answer the complaint and hear the evidence of witnesses, rather than dispose of the matter on affidavits.

CONSTITUTIONAL LAW (115)—EQUAL PROTECTION OF THE LAWS—OCCUPATIONS AND EMPLOYMENT IN GENERAL. Rem. Comp. Stat., §§ 7611-7613, legalizing labor unions and regulating injunctive relief in actions between employer and labor, would be violative of the equal protection clause of the fourteenth amendment to the Federal constitution, unless the same remedy be accorded in all cases of controversy between employers and labor as would be accorded any other complainant whose rights are invaded by irreparable injury.

Appeal from an order of the superior court for King county, Griffiths, J., entered September 14, 1921, denying a temporary injunction in an action to restrain picketing, after a hearing before the court upon affidavits. Reversed.

*Farrell, Kane & Stratton* and *Guie & Halverstadt,* for appellant.

*Rummens & Griffin,* for respondents.

HOLCOMB, J.—Upon a complaint filed in the court below against all of the defendants named therein, a temporary restraining and show cause order was issued out of the court on August 25, 1921, returnable on September 8, 1921, ordering them to show cause on that day why the temporary restraining order should not be continued in force during the pendency of the action. By a later order, the show cause order was continued

until September 9, 1921, upon which date the matter came on for hearing on the order to show cause. On September 9, the hearing proceeded upon affidavits until September 13, at 3:30 p. m., both parties having read numerous affidavits for and against the continuance in force of an injunction order, and upon the conclusion thereof, the trial court made an order refusing to continue the temporary restraining order in force and effect, denying a temporary injunction pending the trial of the cause, and finding that the defendants were and are insolvent.

Thereupon the plaintiff gave oral notice in open court of an appeal from the order of the trial court, to this court, and requested the court to fix a supersedeas bond, which the trial court thereupon fixed in the sum of ten thousand dollars, and the supersedeas bond was thereafter given by appellant.

The substance of the complaint against the defendants is, briefly: That plaintiff is a corporation, engaged in the ownership and operation of coal mines in King and Pierce counties, Washington; that District No. 10, United Mine Workers of America, is a voluntary unincorporated association composed of miners and men employed in the mines; that Newcastle Local No. 2362, United Mine Workers of America, is a voluntary unincorporated association of the State of Washington, and is a subsidiary or branch of District No. 10, United Mine Workers of America. That the officers and members of District No. 10, United Mine Workers of America, number approximately two thousand persons, and are too numerous to name as defendants; that the officers and members of Newcastle Local No. 2362, United Mine Workers of America, comprising several hundred persons, are too numerous to be named individually as defendants.

It is further alleged that the value of the mines of plaintiff is many hundred thousand dollars; that, for many years prior to November 1, 1917, it had operated its mines under agreements in writing with District No. 10, which agreements affect wages, working conditions, etc., of the miners. That, on November 1, 1917, plaintiff entered into a contract with District No. 10 which fixed a scale of wages and working conditions, which should continue in effect for a period not exceeding two years from August 31, 1918; that the mines of plaintiff, including the Newcastle mine, were operated under the agreement of November 1, 1917, until November 1, 1919, at which time the men employed in its mines went on strike contrary to the terms of the contract, and remained on strike until December 14, 1919, at which time the mines were reopened under a temporary settlement effected by the President of the United States, under which the workmen were given an increase of fourteen per cent over the wage scale in effect in November, 1919, such increase to remain in effect pending the creation of a National Bituminous Coal Commission, and the determination by that Commission of a wage scale to be used as a basis for new agreements.

That, on March 10, 1920, the United States Bituminous Coal Commission, which had been appointed by the President, made its report, but specifically excepted the state of Washington. That commission directed that District No. 10, and Washington Coal Operators Association, each select two members of a commission, and that the four parties so selected should appoint an experienced mining engineer, who should also be a member of the commission. This commission was to report within thirty days to the joint conference of mine workers and operators of the state of Washington concerning the application of the awards

made elsewhere, to the agreements and schedules of this state. A wage scale was agreed on by the Washington Commission on about July 20, 1920, and put into effect August 1, 1920.

That about August 29, 1920, District No. 10, through its officers, began requesting conferences with plaintiff and other coal operators in this state, for the purpose of presenting demands for a further increase of $1.50 per day to all scale men, because such increase had been granted by operators to miners in the eastern coal fields of the United States; that, in order to prevent a strike, plaintiff was obliged to and did grant the increase effective September 10, 1920, it being distinctly understood that it would be impossible to continue that increase for any definite length of time; that the scale of wages made effective on September 10, 1920, remained in effect until March 15, 1921; that on February 28, 1921, plaintiff being unable to pay the scale of wages then in effect, notified in writing all of its employees of such fact, and that on and after March 15, 1921, the wage scale and contract of October 19, 1919, would be put into effect.

That in April, 1921, a commission was formed by the Director of Labor and Industries of this state to determine the basis upon which operations could be resumed in the coal mines. In June the commission submitted a wage scale, which wage scale was promptly accepted by plaintiff. On about August 5, 1921, the defendant District No. 10, United Mine Workers of America, and the defendant Newcastle Local No. 2362, refused to accept the proposed wage scale, or any reduction in wages, and since that time most of the members of the local have not worked in plaintiff's mines. That, about August 9, 1921, the plaintiff began preparations to open its Newcastle mine, and to secure the necessary employees therefor; that operation of the

mine was resumed August 15, 1921; that the defend-
ants at all times thereafter have been determined to
prevent, and are now determined and attempting to
prevent, plaintiff from operating its mine unless and
until it shall agree to pay the scale of wages in effect
at the time the operation thereof ceased, as above set
forth, and until it shall employ only members of the
defendant District and Local Union; that plaintiff did
not discharge its employees, but they refuse to work
for it, and left their employment; that, in order to
secure the necessary employees to operate its mine,
plaintiff has been compelled to bring men in from other
parts of the state and elsewhere, and the means of
transportation to the village of Newcastle is by rail-
road and stage line, which stage line is operated by the
defendant Thompson; that it is necessary that em-
ployees traveling to Newcastle disembark from the
railroad train and stage line at a distance of about
one-fifth of a mile from the hotel at which they can
remain, and are required to go about one-third of a mile
from the depot to the mine of the plaintiff; that, on
and since August 15, 1921, upon the arrival of railroad
trains and stages at Newcastle, carrying employees of
plaintiff, the members of District No. 10, approxi-
mately one hundred and fifty to two hundred in num-
ber, together with many women and children, congre-
gate about the depot and terminus of the stage line,
and meet plaintiff's employees as they arrive, and hiss,
hoot, jeer, yell and call them "scabs" and other
epithets, and make demonstrations such that the em-
ployees of plaintiff are put in fear for their personal
safety, all of which is done by the defendants for the
sole and only purpose of preventing such employees
from going to work or remaining at work at plaintiff's
mine, and not otherwise; that the county roads in the
vicinity have been and are picketed and the roads in

and around plaintiff's mine have been and are picketed; that the employees of plaintiff are compelled to go to and return from their work through the picket line thus formed; that the pickets hiss, hoot, jeer, and yell "scab" and other epithets while such employees are on the roads; that the picketers are members of District No. 10, and the picket line is established for the purpose of aiding the defendants in preventing plaintiff from operating its property and employing men to work in its Newcastle mine. That by reason of the acts and things done by the defendants for the purposes mentioned, the employees of plaintiff fear for their personal safety, and are induced to leave its employ. That the actions of defendants are done solely for the purpose of intimidating the workmen who seek and desire employment, in order to prevent them from accepting and remaining in such employment at the plaintiff's mine. That, if defendants are not enjoined from such acts, plaintiff, by reason thereof, will be unable to operate its mines except with a large and substantial loss and will be prevented from supplying itself with the required labor. That the acts above set forth constitute a conspiracy on the part of the defendants for the purposes above stated; that the defendants herein are all insolvent.

It was further alleged that the plaintiff had already been damaged in the sum of ten thousand dollars and that, unless the defendants are restrained and enjoined, they will continue to carry on such practices, and occasion substantial and irreparable loss and damage, and that the defendants are insolvent and unable to respond in damages. There was a prayer for a money judgment for all damage theretofore sustained, and thereafter to accrue, and for a restraining order and injunction enjoining the carrying on of the alleged conspiracy.

At the threshold, we are met with several motions to dismiss appeals made by several defendants.

One is made by the defendant George Ayers, who appeared separately and presented his own defense, which motion must be granted. It is shown, and nowhere controverted, that he is not and was not a member of the defendant unions. All that he did was to refuse to reenter the employment of appellant, which he had theretofore had. There is no evidence that he picketed the mine, or had anything to do with the acts complained of. The appeal as to him is dismissed.

Another motion is by respondent Will Thompson. Inasmuch as the assignments of error by appellant except defendant Thompson, thereby confessing that the trial court committed no error in vacating the temporary restraining order and denying a temporary injunction as to him, he is entitled to be dismissed from this appeal. It is so ordered.

Another motion is made by all the other defendants to dismiss the appeal for the following reasons: (1) that no notice has been given sufficient to confer jurisdiction upon this court, and the notice given was ineffective for any purpose; (2) that the order attempted to be appealed from is not an appealable order.

As to the first ground, counsel for respondents contend that the notice of appeal given in open court on September 14, 1921, at the time the order was made and entered, dissolving the temporary restraining order, was premature. That such notice of appeal was insufficient to confer jurisdiction because defendants had interposed a timely motion for a new trial on the question of insolvency, thereby preventing the judgment then entered from becoming a final judgment until the motion for a new trial had been determined.

This ground is not well taken. A motion for a new trial was not necessary in order that questions when

decided by the lower court might be reviewed here on appeal, but is necessary for a review of questions not presented to the trial court during the progress of the trial. *Dubcich v. Grand Lodge A. O. U. W.,* 33 Wash. 651, 74 Pac. 832.

Nor is the second ground well taken. The appeal here is not from a final decree, but from an interlocutory order. The statute, Rem. Comp. Stat., § 1716, subd. 3, allows an appeal from an order granting or denying a motion for a temporary injunction, heard upon notice to the adverse party, and from any order vacating or refusing to vacate a temporary injunction. It is also provided that no appeal shall be allowed from any order denying a motion for a temporary injunction or vacating a temporary injunction unless the judge of the superior court shall have found upon the hearing that the party against whom the injunction stood was insolvent.

It was so found in this case. That finding, under that subdivision, gave the appellant the right to appeal to this court, and gave this court jurisdiction of the appeal. We therefore cannot dismiss it as to the defendants not hereinbefore dismissed. *State ex rel. Young v. Superior Court,* 43 Wash. 34, 85 Pac. 989. Neither can we determine, for the purpose of ousting ourselves of jurisdiction upon appeal, that the finding that the defendants were insolvent, was unjustified. The trial court so found, and refused to reopen the case or hear further evidence upon that phase of the matter, and the finding, for the purposes of this appeal, must stand.

The trial court having allowed and fixed supersedeas on appeal, the matter now stands as if the temporary restraining order is still in force.

Many matters are presented and argued herein which may be freely conceded. For instance, it must

be freely conceded that laborers may unite together in a labor union for the purpose of the betterment of their conditions, and for any other lawful purpose; that they may unite in striking or leaving the employment of an employer; that it is lawful so to do; that they may use peaceable methods of obtaining their purpose, by persuasion, informing others of their purpose, and of the situation and conditions, and obtaining information as to their rights, and as to the situation and condition of others, either individually or unitedly. The highest court in the land has but recently decided that these things are legal and proper. *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184.

We freely recognize the right to organize and unite on the part of working men, and the right to strike. We also recognize the right to do all things in a peaceable way necessary to be done to attain the purposes of the organization or of the strike. The question here is not whether the defendants are being accorded their right to organize or unite and to strike and refrain from working for appellant, and to demand higher wages. The question to be determined is, are they pursuing their lawful purposes by lawful methods?

The affidavits of nearly fifty persons were introduced by appellant, all tending to show that the respondents were picketing, and by boisterous, harrassing and annoying methods were studiously and insistently endeavoring to coerce and intimidate employees and intending employees of appellant. It is true respondents attempt to show that they did not "picket" the highways and property surrounding the property of appellant, nor to coerce the employees and intending employees of appellant, and that all they have done is to constitute committees to talk with the union men, mingle with the crowd and preserve peace. But there

are the affidavits in the record of two persons who were present at the union local meeting when the so-called "committee" was appointed and constituted, and a certain person placed in charge thereof. There is evidence that several persons were so harrassed and annoyed by these committeemen, or pickets, or whatever they may be called, and by the respondents generally congregating in certain convenient places for that purpose, that they left the employ of appellant. There is evidence that others were made ill. There is some evidence that interference with employees of appellant by strikers resulted in assault and battery. There is no doubt that respondents, with the exception of those who have been dismissed, or their associates and co-members and families, assembled on the main road very early in the morning, and jeered and hooted at the employees of appellant, and some of them went so far as to use veiled threats which had a sinister appearance to those against whom they were used.

While the affidavits on the part of respondents in many instances attempt to explain the conduct alleged by affiants for appellant as being merely facetious, or fun-making, there can be no doubt that much of it would be considered very threatening and sinister by those to whom addressed. If so, they were intended to be so, and were actually intimidating to those addressed, as shown by their affidavits.

Session Laws of 1919, p. 568, ch. 185, § 2 [Rem. Comp. Stat., §§ 7611-7613], an act legalizing labor unions and declaring them to be lawful organizations, and relating to the powers of the courts in this state in granting injunctions, and declaring the rights of labor, does not legalize nor attempt to legalize unlawful acts. It does not forbid injunctions against unlawful acts, but expressly permits them in cases where necessary to prevent irreparable damage to property

or to personal or property rights, for which injury there is no adequate remedy at law.

The above act is very similar to the provisions of §§ 6 and 20 of the Clayton Act of Congress (page 323, 38 Statutes at Large, 738). Section 20 of the Clayton Act, however, contains considerable more forbidden matter than our act does.

It was held in *American Steel Foundries v. Tri-City Central Trades Council, supra,* by the United States supreme court, that § 20 of the Clayton act introduced no new principle into the question of the jurisdiction of the federal courts, but was merely declaratory of what was the best practice always. It was there held that "if, in their attempts at persuasion or communication with those whom they would enlist with them, those of the labor side in an industrial dispute adopt methods which, however lawful in their announced purpose, inevitably lead to intimidation and obstruction, then it is the court's duty, unmodified by the terms of the Clayton Act of October 15, 1914, § 20, which forbid an injunction against recommending, advising, or per- suading others by peaceful means to cease employment and labor, or against attending at any place where such person or persons may lawfully be for the purpose of peacefully obtaining or communicating information, or peacefully persuading any person to work or to abstain from working, or against peaceably assembling in a lawful manner and for lawful purposes, so to limit what the propagandists do as to time, manner, and place as shall prevent infractions of the law and viola- tions of the right of the employees, and of the employer for whom they wish to work." It is also held that picketing in groups of from four to twelve near an employer's place of business during a strike, accom- panied by attempts at persuasion, or communication

with those entering or leaving the plant, with the inevitable result of intimidation of employees and would-be employees, and of obstruction of, and interference with, the business of the employer, is unlawful and may be enjoined, notwithstanding the provisions of § 20 of the Clayton Act. It is also held that the extent to which picketing in an industrial dispute should be enjoined is a question for the judgment of the judge who has heard the witnesses, familiarized himself with the *locus in quo,* and observed the tendencies to disturbance and conflict. The purpose should be to prevent the inevitable intimidation by the presence of large groups of pickets, but to allow missionaries.

In this case no witness has been *heard.* All that has been done is to read affidavits of divers persons without testing their knowledge, or intelligence, or credibility, by cross-examination and by observing their conduct and demeanor. What should have been done in this case was to have required respondents to answer the complaint, formulate issues, and go to trial upon the merits. That could have been done without much delay. Then there would have been testimony given in open court, and a final decree rendered upon the merits.

The public is vitally interested in this controversy, both from economic and civic considerations. As it is, we have before us a situation which appears to be threatening, and to be to some extent lawless and disorderly. Such a condition could not be permitted, and no harm could come to anyone from preventing lawless acts by a restraining order or temporary injunction, and by trying the case fully on the merits.

We must say, in conclusion, that appellant has raised the question of the equal protection of the laws under the Fourteenth Amendment to the Federal Constitution, which, if their rights have been violated by

the acts complained of and set forth in their numerous affidavits, they are entitled to, notwithstanding the statute heretofore referred to regarding the rights of labor. On a similar statute, although it is almost identical with § 20 of the Clayton Act, enacted in Arizona, where the same provisions of the Federal Constitution as to equal protection of the laws under the Fourteenth Amendment were invoked, the United States Supreme Court held that such act as the Arizona statute was violative of the equal protection clause of the Constitution of the United States, unless the same remedy be accorded under it in all cases of controversy between employers and labor, as would be accorded any other complainant whose rights were invaded in his person or his property so as to create irreparable injury and damage. *Truax v. Corrigan,* 257 U. S. 312.

We think the case should be tried fully upon the merits except as to those respondents who have been dismissed; and upon the going down of the remittitur, the trial court should require the respondents to answer to the complaint as speedily as may be possible, and proper for them, and go to trial thereon very speedily thereafter. It is a case which should be tried upon the testimony of witnesses principally, and not upon affidavits. In other words, it should be tried fully and finally upon its merits in open court, and a proper decree rendered.

Reversed and remanded, with instructions to proceed in conformity herewith.

PARKER, C. J., BRIDGES, MACKINTOSH, and MITCHELL, JJ., concur.