[No. 28036.   Department One.   January 17, 1941.]

RALPH S. PIERCE, *Appellant,* v. PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA, *Respondent.*[1]

[1]Reported in 109 P. (2d) 322.

152

*Gordon H. Sweany* and *Shank, Belt, Rode & Cook,* for appellant.

*Padden & Moriarty,* for respondent.

STEINERT, J.—Plaintiff brought suit to recover upon two accident insurance policies. Trial to a jury resulted in a verdict in plaintiff's favor. Defendant interposed motions for judgment notwithstanding the verdict and for a new trial. The court granted the former motion and denied the latter. Judgment of dismissal was accordingly entered, and plaintiff appealed.

The policies in question were issued by respondent in 1926 and 1927, respectively, and, in addition to their principal sums, provided for a weekly payment of fifty dollars as insurance and indemnity to appellant

"AGAINST Bodily Injury sustained . . . solely through accidental means . . . and resulting directly, independently and exclusively of all other causes, in—

"(A) Immediate and continuous total disability that prevents the Insured [appellant] from performing any and every kind of duty pertaining to his occupation, . . ."

The "bodily injury" relied upon for recovery, in this instance, was a cerebral hemorrhage sustained by appellant, and alleged by him to have been caused by fright, mental shock, and severe physical strain induced by the sight of what, in the mind of appellant at the time, was an immediately imminent automobile collision involving himself. The answer denied liability under the terms of the policy.

The general question presented upon the appeal is whether or not the evidence was sufficient to sustain the verdict. The specific questions raised thereunder are: (1) Whether the "injury" occurred at the time, and in consequence, of the alleged fright and strain, or whether, on the contrary, the injury occurred some time prior to such fright and strain; (2) whether or not fright, or mental shock, unaccompanied by physical impact, is sufficient to constitute "accidental means" within the purport of that term as used in the policies; and (3) whether or not the evidence was sufficient to warrant a finding that the fright or shock was the sole, proximate cause of the "injury," resulting "directly, independently and exclusively of all other causes" in appellant's disability.

In passing upon a motion for judgment notwithstanding the verdict, we must not only accept as true all competent evidence in the record in favor of the party for whom the verdict was rendered, but must also give him the benefit of every favorable inference which reasonably may be drawn from such evidence. *Vercruysse v. Cascade Laundry Co.,* 193 Wash. 184, 74 P. (2d) 920; *Beck v. Dye,* 200 Wash. 1, 92 P. (2d) 1113; *Pyle v. Wilbert,* 2 Wn. (2d) 429, 98 P. (2d) 664; *Wiggins v. North Coast Transportation Co.,* 2 Wn. (2d) 446, 98 P. (2d) 675.

The undisputed facts are as follows: At the time involved in this action, appellant was fifty-nine years

of age and had been actively engaged in the practice of law for thirty-five years. His home was located near Medina, about five miles south of Kirkland, on the east side of Lake Washington, opposite Seattle. The road between Medina and Kirkland ran in a winding course, and made many right-angle turns. In passing through Kirkland, the road executed two such turns. Appellant had customarily, for many years, driven his automobile over this route to and from his office in Seattle.

On the morning of December 6, 1938, appellant arose as usual, apparently in the same state of health as that which he had enjoyed for the past several years, and, after breakfast, at about eight o'clock, started for Seattle in his automobile. He drove over the usual route to, and partly through, Kirkland without experiencing any difficulty. Driving at the rate of approximately twenty miles per hour, he approached an obstructed corner located at the second of the right-angle turns above mentioned, in Kirkland. Following the turn, he had proceeded about one-third of the way around the corner, or about twenty or thirty feet into the intersection, when he suddenly saw two cars approaching him from the opposite direction, and about twenty or thirty feet ahead of him. One of the approaching cars was on the wrong side of the road, that is, it was partly on appellant's side of the highway. The width of the highway was about twenty feet. Appellant became badly frightened, thinking that, under the circumstances, he would be unable to pass abreast of the approaching cars, and that a collision was therefore inevitable.

In an endeavor to avoid a collision, appellant immediately "slammed on the brakes," and his car proceeded at an angle, toward the opposite side of the street, and then, within fifteen or twenty feet, and

while still in gear, came to a stop. Immediately upon seeing the situation ahead of him, appellant became aware of "feeling a weakness in his right arm," and by the time that his car came to a stop he had lost consciousness. There was no collision, however, and appellant sustained no external injuries. The record does not disclose whether the oncoming cars passed in front, or in the rear, of appellant's car. Appellant had no knowledge upon that subject, and no witness to the event was available. According to appellant's testimony, the whole occurrence took place in a "split-second."

After an uncertain period of time, appellant regained consciousness, started his engine, proceeded to his right side of the highway, and drove on to Seattle, arriving at his office about an hour late. His recollection of the events occurring after he had regained consciousness and during the remainder of the trip was vague. He had a faint recollection of having run off the side of the road somewhere along the way between Kirkland and Seattle, and recalled that he had stopped twice in obedience to stop signals. He arrived at his office, however, without further mishap. He described his condition at the time of his arrival there as "woozy, decidedly woozy and hazy."

On appellant's arrival at his office, some of his business associates attempted to confer with him, and observed that he had difficulty in speaking, that his face was distorted, and that he was obviously ill. He was thereupon immediately taken to a physician, who diagnosed his condition to be that of a cerebral hemorrhage, or stroke. At that time, the right side of appellant's face and also his right leg were paralyzed and his right arm was partially paralyzed. Appellant was at once taken to a hospital, where he remained for approximately ten days. He was then removed to

his home, where he was confined to his bed until April, 1939. Since then, his condition has improved to some extent. At the time of the trial, his face had regained its normal appearance, and he was able to walk about, although his arm and his leg were still partially paralyzed. He could not write; at times he could not control his voice; and he had been continuously unable to perform any of the duties of a lawyer.

In connection with, but antedating, the events just narrated, some other facts, which are also undisputed, should be stated.

For ten or fifteen years prior to the above occurrence, appellant had been afflicted with arteriosclerosis and hypertension. In November, 1932, he suffered a slight cerebral hemorrhage, and was hospitalized for a period of six days. He recovered from that attack, however, to the extent that he was able to resume his usual work as a lawyer, although he continued to have arteriosclerosis and high blood pressure. He was accordingly advised by his physician to avoid stress and strain, inasmuch as a person in his condition is more susceptible to cerebral hemorrhage than is a normally healthy person.

Since that time, however, and for several years just prior to December, 1938, appellant had apparently been in good health, and had not been aware of any effect of his arteriosclerosis other than that he had experienced some trouble, at times, with his legs. He had been able to attend to all of his duties in connection with his profession. Between September and December of 1938, he had conducted four trials in the superior court, and had argued one case before the supreme court, besides attending to all the routine duties of his office. One of those four trials, lasting several days, he had conducted the week before the unfortunate occurrence. On the Thursday preceding

his stroke, he had driven to Montesano, where on the following day, he argued a legal matter. Returning to Seattle by automobile, he had gone to his office on Saturday as usual. After a quiet day at home on Sunday, he resumed his work on the following day, Monday, which was the day before the fateful trip.

It is conceded that among the recognized causes of cerebral hemorrhages are excitement, fright, and sudden physical exertion, and any other mental, emotional, or physical activity which has the effect of raising a person's blood pressure. It is also conceded that a person afflicted with arteriosclerosis or hypertension is more susceptible to cerebral hemorrhage than is a person not so afflicted.

There is no dispute in this case that appellant sustained a cerebral hemorrhage on December 6, 1938, or that the events above narrated actually occurred. The principal dispute presented by the briefs of counsel concerns the exact point of time at which the alleged "injury" was sustained. That is the first of the three specific questions already stated.

Respondent contends that the evidence proves conclusively that a rupture of one of the blood vessels in appellant's brain must have occurred at least three or more seconds before the alleged stroke manifested itself, and that, consequently, the cerebral hemorrhage cannot be attributed to the shock sustained by appellant while turning the corner, since what transpired in the intersection all took place within a "split-second."

According to all the medical testimony in the case, some interval of time, however slight, must elapse between the bursting of a blood vessel and the resulting physical manifestations. The interval of time varies according to the magnitude and nature of the hemorrhage. In the case of a slight hemorrhage, which

results in a slow leakage, it may take as long as several hours to cause the formation of a blood clot sufficient to produce paralysis. In the case of a "massive" hemorrhage, the effect may be almost instantaneous. The interval, in any instance, is determined by the length of time required for a sufficient amount of blood to escape from the blood vessel after a rupture occurs.

Respondent's three medical witnesses testified that the interval of time between a hemorrhage and the resulting physical helplessness would, in any instance, except in the case of a massive hemorrhage, be at least three seconds. Appellant's medical witness, who was his attending physician, testified that, in case of a small hemorrhage, it would take "one or two or three seconds," or "within two or three seconds," to cause loss of consciousness or partial paralysis. He further testified that, in his opinion, it was possible for one driving an automobile to have a cerebral hemorrhage to the extent of losing consciousness, and thereafter, within a short period, regain consciousness and resume driving.

Respondent's counsel reason thus: The shortest length of time elapsing between a cerebral hemorrhage and its manifestation of weakness, physical helplessness, or unconsciousness, is, according to the evidence in this case, from three to five seconds. Appellant was driving at a speed of approximately twenty miles per hour, or about thirty feet a second; at that rate, he would travel ninety feet in three seconds. Appellant had proceeded only twenty or thirty feet into the intersection when, on seeing the approaching cars in front of him, he became aware of a helpless feeling in his right arm. He then proceeded forward, with the brakes. set, for fifteen or twenty feet, and lost consciousness. His emotional shock, his con-

vulsive effort in grasping the automobile wheel, his appreciation of a helpless feeling in his right arm, his application of the brakes, his progress forward, and his loss of consciousness, all took place in a "split-second." Therefore, the precipitating rupture of the blood vessel must have occurred at least ninety feet away, that is, before appellant had even reached the intersection where he received the shock which he claims to be the proximate and sole cause of his disability.

The difficulty with that reasoning is that it is predicated upon the assumption that the time and distance elements were established with absolute precision and certainty, as though the one had been determined by means of a stop watch and the other with a tapeline, and as though the eyes of appellant were constantly fixed upon his speedometer. It is manifest that appellant was simply estimating the rate of speed at which he turned the corner; and what his speed was after he "slammed on the brakes" and until he became unconscious, was not even estimated. It is also obvious that appellant's statement that the whole occurrence took place in a "split-second" was not intended as a positive and exact measurement of time, but was simply his way of describing the swiftness of the succession of events. It will be recalled, also, that appellant's recollection of what had transpired, other than that he became frightened, was vague and hazy.

Moreover, respondent's theory is not borne out by the testimony of its own witnesses. They all, without exception, testified that, in their opinion, appellant did not sustain a cerebral hemorrhage until *after* he had arrived at his office. They could not, however, account for appellant's lapse into unconsciousness at the scene of events above described.

Appellant's medical witness, on the contrary, testified that, in his opinion, the hemorrhage occurred at the instant that appellant became unconscious; that the hemorrhage was caused by the bursting of a blood vessel; and that the precipitating cause of the rupture was a combination of the fright sustained by appellant and the sudden physical effort then exerted by him.

The question as to the time when the cerebral hemorrhage occurred was one to be determined upon the testimony of the medical witnesses. There was substantial testimony supporting two conflicting theories. The issue thus became a question of fact for the jury, and its verdict is controlling thereon. *Senske v. Washington Gas & Elec. Co.,* 165 Wash. 1, 4 P. (2d) 523; *Hill v. Great Northern Life Ins. Co.,* 186 Wash. 167, 57 P. (2d) 405; *Hemrich v. Aetna Life Ins. Co.,* 188 Wash. 652, 63 P. (2d) 432.

The second specific question raised is whether or not fright, or mental shock, unaccompanied by physical impact, is sufficient to constitute "accidental means" within the purport of that term as used in the policies.

It has been definitely settled in this jurisdiction, in negligence cases, that damages are recoverable for personal physical injuries resulting from fright, even though there be no physical impact involving the person sustaining the fright, provided that the negligent act of the defendant was the proximate cause of the fright, such physical injuries being distinguishable from purely mental distress or psychological disorders. *O'Meara v. Russell,* 90 Wash. 557, 156 Pac. 550, L. R. A. 1916E, 1743; *Frazee v. Western Dairy Products,* 182 Wash. 578, 47 P. (2d) 1037.

In the *O'Meara* case, *supra,* the plaintiff suffered physical injuries as a direct result of a fright sustained when, in the course of certain blasting operations carried on by the defendant, a stump was thrown through the air

and struck the eaves of plaintiff's house. In allowing recovery, this court said:

"It is true there was no physical impact of the stump against the person of Mrs. O'Meara. But it is manifest that if this stump had touched the person of Mrs. O'Meara in the slightest degree, then the appellants [respondents], under all the authorities, would be entitled to recover for all resulting injuries. The mere fact that it did not touch her seems not a sufficient reason for holding that the results which follow may not be recovered for. When Mrs. O'Meara heard the blast which hurled the stump in her direction, and when she saw the stump coming, she no doubt stated truthfully that she thought it would strike her. It did not strike her; but it struck the house a few feet above her head. That she was frightened, there can be no doubt. She clearly was justified in attempting to escape from the peril which then confronted her. And if in attempting to escape, even by leaving the house, or running up a hill, which she did, injuries were caused to her person thereby, it seems upon reason, as well as upon authority, that she would be entitled to recover for the injuries naturally resulting from that fright.

"We think this case is entirely different from a case where the injuries are psychological and not physical. In this case the injuries resulting from the fright were physical injuries. They were not psychological or mental. It seems, under these circumstances, where there is physical injury which results naturally, that the injured person is entitled to recover equally as though there had been a direct impact which caused the same injury."

In the Frazee case, *supra*, a woman suffered severe physical disabilities as the result of extreme fright experienced upon witnessing a runaway truck, which she apprehended would crash into her home and injure her small son, who was on the front steps at the time. Although her apprehensions did not materialize, she was allowed to recover for the negligent act of the driver of the truck. The opinion in the case quotes

liberally from, and relies largely upon, the reasoning and the result in the *O'Meara* case, *supra*.

Although the case at bar is an action upon a contract, and not one arising in tort, the principle of law above stated is equally applicable to both situations. The element of fright supports recovery, not because of the peculiar nature of the action brought, but because its connection with physical injury has been recognized. The question is simply one of proximate cause; the nature of the action brought is immaterial.

The terms "accident" and "accidental means," as used or referred to in insurance policies, have been variously defined, as will be found by reference to 5 Couch, Cyclopedia of Insurance Law, 3963-3978, § 1137; 1 Words & Phrases (Perm. ed.), 379; and the many cases therein cited. All of the definitions include the idea that the means as well as the result must be unforeseen, involuntary, unexpected, and unusual; that it must be a happening by chance. However the terms may be defined, we have no hesitancy in declaring that appellant's experience within the intersection constituted an accident, as that term is commonly understood, and that the injuries then and there sustained by him were sustained through "accidental means."

The final question raised is whether or not the evidence was sufficient to warrant a finding that the fright or shock was the sole proximate cause of the injury, resulting directly, independently, and exclusively of all other causes in appellant's disability. As in the two preceding inquiries, the question is not to be determined by what we, if sitting as triers of the fact, would hold in that respect, nor is it to be determined by a consideration of whether the preponderance of the evidence was one way or another. The question is solely whether or not there was substantial evidence

in the record to support a finding such as the jury must have made in arriving at its verdict.

The circumstances regarding appellant's physical condition prior to, and at the time of, the particular occurrence have already been delineated. Respondent contends that appellant's arteriosclerosis, which is a progressive and degenerative disease, was the sole, or at least a contributing, cause of the hemorrhage, and that the disability suffered on December 6, 1938, was merely the expected result of a preexisting diseased condition. Appellant, on the other hand, contends that his prior physical condition was not the *cause* of his present disability, but was merely a *condition* upon which the accidental events in Kirkland operated, and that it was the occurrence at the intersection which constituted the sole *cause* of his present incapacity.

The question is by no means free from difficulty, and the innumerable cases involving facts of more or less similarity to those before us demonstrate the contrariety of results and the trouble that they have given the various courts. It is, of course, easily conceivable that a man might be suffering from arteriosclerosis to such a marked degree that his ultimate collapse is but a matter of time, regardless of other circumstances, and that the actual event merely determines the *place* of the collapse, and not its *cause*. On the other hand, the disease may not have reached a virulent state, nor have progressed to such a degree that one might not, with proper care, and in the absence of undue physical or mental strain, escape any serious consequences for an indefinite length of time. While many men do die suddenly and unexpectedly of a stroke resulting from arteriosclerosis, many others having the same disease live to an advanced age.

The mere fact that hypertension and arteriosclerosis render one more susceptible to cerebral hemorrhages,

is clearly not determinative of the question. If such were not the case, the benefits of accident insurance would be available to those in perfect health only, for in every instance it could well be argued that, were it not for the weakened condition of the individual, the disability would not have resulted or, else, would have been less pronounced.

The general rule adopted by the majority of the courts in such cases, is that the direct and proximate cause is that which sets in motion a train of events which brings about a result without the intervention of any force operating or working actively from a new and independent source. *Hanley v. Occidental Life Ins. Co.,* 164 Wash. 320, 326, 2 P. (2d) 636; 6 Couch, Cyclopedia of Insurance Law, 5311, § 1471.

The statement of the general rule, however, simple as it may at first seem to be, does not fully solve the difficulty inhering in many complex situations. It is easy to give a definition of "proximate cause," but it is not so easy, at times, to determine the particular factor which precisely meets the requirements of the definition. In short, the difficulty is always that of applying the definition to a given state of facts, that is, to determine what *was* the thing that set in motion a train of events which brought about a certain result, and whether or not other factors were intervening forces "operating or working actively from a new and independent source."

Confining ourselves to that branch of the law involving accident insurance policies, we have an expression by this court as to the proper test of causation. In the *Hanley* case, *supra,* we quoted with approval the following statement from *Driskell v. U. S. Health & Accident Ins. Co.,* 117 Mo. App. 362, 93 S. W. 880, wherein the analogous provision in the policy was "if death should result solely from such injuries":

" ' "We think the only reasonable interpretation to be placed upon this clause is to say that the injury must stand out as the predominant factor in the production of result and not that it must have been so virulent in character as necessarily and inevitably to have produced that result regardless of all other conditions and circumstances. People differ so widely in health, vitality and ability to resist disease and injury, that what .may mean death to one man would be comparatively harmless to another and, therefore, the fact that a given injury may not be generally lethal does not prevent it from becoming so under certain conditions; and if, under the peculiar temperament or condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury." ' "

The concluding sentence of the paragraph just quoted seems to us to furnish the answer to the particular question in this case. The appellant may have had a diseased condition which deprived him of the normal power of resistance to the effects of undue strain or fright, and it may have been a necessary condition to the result, but his physical condition did not necessarily deprive the strain or fright of its character as the predominant factor in the production of the result. In other words, appellant's prior state of health was but a condition, and not a concurring cause.

It will be understood, of course, as frequently indicated above, that the one basic question which we

166

have to decide is whether or not there was sufficient evidence to warrant the jury in finding that the occurrence at the intersection in Kirkland was the proximate cause of appellant's injury and disability. There was ample evidence, in our opinion, to make that a question of fact for the jury. Its verdict is therefore controlling.

The judgment is reversed, with direction to the trial court to reinstate the verdict.

MAIN, DRIVER, and BLAKE, JJ., concur.

ROBINSON, C. J. (dissenting)—Although I signed the above opinion when it first came before me for consideration, I have, upon further reflection and study, become convinced that the trial court was justified in setting aside the verdict. I therefore dissent.

