[No. 28034. Department One. October 24, 1941.]

MARY E. KEILHAMER et al., Respondents, v. WEST COAST TELEPHONE COMPANY, Appellant.[1]

[1]Reported in 118 P. (2d) 173.

*Henderson & McBee,* for appellant.

*James G. Smith, Boynton Kamb,* and *Welts & Welts,* for respondents.

DRIVER, J.—Mary E. Keilhamer and her husband brought this action to recover for personal injuries which they alleged she sustained from a telephone receiver "through the defendant negligently causing or negligently permitting a severe shock, electric impulse or tremendous vibration to come into her ear, head and body. . . ." A trial before a jury resulted in a verdict for the plaintiffs. Timely motions by the defendant for a directed verdict and for judgment

notwithstanding the verdict were severally denied. Defendant also moved for a new trial, but, when the motion came on for hearing, it was expressly waived by defendant's counsel. From a judgment entered on the verdict, defendant has taken this appeal. For convenience, we shall hereinafter refer to Mary E. Keilhamer as if she were the only respondent.

Appellant's assignments of error present two questions: (1) Was the evidence sufficient to sustain the verdict; and (2) were the trial court's instructions to the jury prejudicially erroneous? Only so much of the evidence as is necessary to a determination of these questions will be stated.

For nine years prior to her accident, the respondent had operated a beauty parlor in Anacortes, personally participating "in all branches" of the work. At the time of the accident, she was forty-one years of age, in good health, and able to work from six to twelve hours a day. She was a subscriber to appellant's telephone service, and had a telephone in her shop.

On the morning of September 9, 1937, after she had shampooed a customer's hair and while she was preparing it for further treatment, the telephone bell rang. The instrument was near at hand and she leaned against her shampoo tray and lifted the receiver to her ear. As to what happened then, we quote directly from the record of her testimony:

"I was phoning, I was talking to my party on the other end, which was Mrs. Becktell, between two and three minutes, when all at once a terrific shock came through and an awful noise, it nearly blowed my head off. What happened then I couldn't tell you, but I do remember that I tried to call the chief operator and I couldn't tell her exactly what happened. Q. Why not? A. Because I don't know what happened to me, I don't remember. Q. Could you talk? A. No, I couldn't. I tried to tell her, but my voice gave out. I don't know what happened from there on. . . . At

the time my face felt just like it was dead. I had no feeling in it, and it gradually got worse, and my tongue felt like it was swelling, so did my face. I couldn't speak until that numbness subsided a little bit and it got a little better, but I had been in bed a great deal of the time."

She stated, too, that the shock affected the right side of her face and neck, her right hand and leg, and her spine, causing pain and numbness in the affected parts; that, by virtue of the experience, she became virtually a physical and nervous wreck; that, up to the time of the trial, which was about two years after the accident, she had been unable to continue her beauty parlor work; and that her injury caused her to lose "pretty close to twenty pounds." A physician who had treated respondent during September, October, and November of 1937, stated:

"Q. Did you examine her? A. I did. Q. What condition did you find the woman in when she first came to you? A. She was in a very highly nervous state and she complained a lot of this pain. She had at that time lost weight, as I remember, and she complained that she could not sleep on account of the pain and she could not concentrate or do her work on account of this pain. Q. Over how many months did you treat her? A. Over a period of three months. . . . Q. In light of the examinations that you made of her, and the observations you made of her and the history of injury she gave you, in your judgment did this woman suffer an electrical shock? A. *Yes, I considered that she had.*" (Italics ours.)

Another physician who "made a thorough physical examination" of respondent in March, 1939, testified as follows:

"Q. What did you find with reference to feeling, or lack of feeling, in the right side of the face, arm and leg, than on the other side? A. They were diminished on the right side. That is, she had practically none on the right side of the face. Q. She had prac-

28

tically no feeling on the right side of the face—what about her side and leg on the right side? A. There were areas that she would have some sensation in, and there were areas where she did not. Q. What about the arm? A. The same was true of the arm. Q. Doctor, from the history she gave you and the examination you made, have you arrived at a conclusion as to what produced this condition in this woman? A. There is no question in my mind, *I think she received an electrical injury.* Q. What do you mean by an electrical injury? A. *A shock and damage to the nervous system from the electric current.*" (Italics ours.)

The customer, who was undergoing treatment in the beauty shop at the time of the accident, testified that she distinctly heard an "awful blast" come over the telephone; that the respondent, after calling central and the chief operator and remonstrating with them, "grabbed her head," sat down, and started to cry; and that she seemed unable to continue her work and had to be put to bed.

The customer's husband, who was seated in an adjoining room, testified:

"A. Well, I was looking at the paper and all of a sudden I heard a large report. I didn't get up at that time, but a few seconds after that Mr. Keilhamer went in there and the next, Mrs. Harris and he were bringing Mrs. Keilhamer into the bedroom through the living room. Q. Can you describe this loud report, what were you doing at the time that it came? A. I was looking at the paper a little bit and talking to Mr. Keilhamer, I had the paper on my lap, I can't just exactly describe that noise except it was a loud sound. Q. Loud enough for you to hear it in this other room and attract your attention? A. Yes, sir. Q. Did it sound like a ring? A. No, it did not. Q. Louder, or softer than a ring? A. Very much louder because I have had the ring happen to me several times; it was an altogether different noise than a ring would be, it wasn't a clacking noise."

Mr. Keilhamer was in the same adjoining room, but he stated that he did not hear the report. Respondent's beauty parlor assistant also witnessed the accident. She stated that "there was a loud explosion and I turned around and saw Mrs. Keilhamer drop the receiver back on the hook and put her hand to her head. . . . "

Respondent called three witnesses who qualified as experts in telephone work and in the installation of electrical and telephone equipment. Their aggregate testimony may be summarized as follows:

There is always danger of excess foreign electricity entering telephone lines, and, to prevent its reaching the instruments and the patrons, devices known as protectors, or lightning arrestors, are customarily employed. Such a device is attached to the subscriber's telephone wire at or within his house or place of business, and its purpose is to carry excess current into the ground before it can reach the telephone set. In the respondent's beauty parlor building, which each of the three expert witnesses had inspected, there was a standard-type protector, but it was defective and had been improperly installed. There were several sharp, right angle bends or turns in the ground wire, within the space of a few feet, where it passed around some attic rafters. This impaired the efficiency of the device, because high voltage electricity does not readily follow sharp angles or turns in a wire, but is likely to jump the wire and take the most direct route to the ground when it encounters them. Furthermore, the ground wire in respondent's premises was attached to a sewer vent pipe, which is not considered a good ground connection. A water pipe is preferable, but, if that is not available, a metal pipe or rod buried at sufficient depth to be in constant contact with moist earth should be employed.

Each of the expert witnesses expressed the opinion that a report or blast loud enough to be heard in an adjoining room, such as the one that came out of the telephone receiver when respondent was using it, indicated the presence on the line and in the instrument of dangerously high voltage, foreign electric current; that nothing else could have caused the report; and that such current would not have flowed over the telephone wire and into the receiver had the protector device been properly installed and grounded on respondent's premises.

The appellant adduced testimony to the effect that the electric current normally used in the operation of a telephone system is harmless; that the only possible sources from which excess foreign current could have got on appellant's telephone system in Anacortes on the day of the accident, were lightning and the power lines of a private power company; and that the weather was clear and without any electrical storm in the vicinity on the day in question, and no wire of the power company was down, or short-circuited, or out of repair.

In considering whether or not the evidence was sufficient to sustain the verdict, we must not only accept as true all competent evidence in the record in favor of the respondent, but also give her the benefit of every inference which reasonably may be drawn from such evidence. *Vercruysse v. Cascade Laundry Co.*, 193 Wash. 184, 74 P. (2d) 920; *Beck v. Dye*, 200 Wash..1, 92 P. (2d) 1113; *Wiggins v. North Coast Transportation Co.*, 2 Wn. (2d) 446, 98 P. (2d) 675; *Pierce v. Pacific Mutual Life Ins. Co.*, 7 Wn. (2d) 151, 109 P. (2d) 322.

So considered, we think the evidence warranted the trial court's denial of the appellant's motions for a directed verdict and for judgment notwithstanding the

verdict. There was substantial evidence to justify a finding by the jury that the respondent's injury proximately resulted from high voltage electricity which came into her head and body through the telephone line and the receiver which she was holding, because of the negligence of the appellant in failing to install and maintain a safe and proper protective device to shunt it into the ground.

Appellant earnestly urges that there was a failure of proof of the presence of any excess foreign current. Specifically, its contention is that, according to undisputed testimony, there were but two possible sources of such current, namely, lightning and the transmission lines of a private power company, and it was shown that it could not have come from either of those sources. Appellant's position is clearly untenable. As we have pointed out, the record contains substantial evidence that excess foreign current was present, and such evidence was not completely nullified by the testimony of appellant's witnesses to the effect that there was no known source from which it could have come. However persuasive appellant's showing in this regard might be, it could not eliminate the factual issue. It merely presented a conflict in the evidence within the province of the jury to determine.

We pass now to appellant's second main contention, that the trial court erred in giving three instructions. Respondent contends that, since the appellant waived its motion for a new trial, it cannot, on appeal, assign as error the giving of instructions, but is limited to the question of the sufficiency of the evidence to sustain the verdict.

It is a long standing and well-established rule of decision of this court that, where a question has been presented to the lower court during the progress of the trial and such court has ruled thereon, the ques-

tion can be raised on appeal without the necessity of first making a motion for a new trial. *Jones v. Jenkins,* 3 Wash. 17, 27 Pac. 1022; *Tullis v. Shannon,* 3 Wash. 716, 29 Pac. 449; *Burns v. Commencement Bay Land, Etc., Co.,* 4 Wash. 558, 30 Pac. 668, 709; *Littlejohn v. Miller,* 5 Wash. 399, 31 Pac. 758; *Tingley v. Fairhaven Land Co.,* 9 Wash. 34, 36 Pac. 1098; *Carter v. Seattle,* 21 Wash. 585, 59 Pac. 500; *Sultan Water & Power Co. v. Weyerhaeuser Timber Co.,* 31 Wash. 558, 72 Pac. 114; *Dubcich v. Grand Lodge A. O. U. W.,* 33 Wash. 651, 74 Pac. 832; *Crooker v. Pac. Lounge & Mattress Co.,* 34 Wash. 191, 75 Pac. 632; *Rowe v. Northport Smelting, Etc., Co.,* 35 Wash. 101, 76 Pac. 529; *Birch v. Abercrombie,* 74 Wash. 486, 133 Pac. 1020, 50 L. R. A. (N. S.) 59; *Pac. Coast Coal Co. v. Dist. No. 10, U. M. W. A.,* 122 Wash. 423, 210 Pac. 953; *Braseth v. Farrell,* 176 Wash. 365, 29 P. (2d) 680.

In *Dubcich v. Grand Lodge,* which has been referred to with approval in three of the later cases cited above, this court said:

"The office of the motion for new trial, in its necessary relation to the appeal, is to give the trial court opportunity to pass upon questions not before submitted for its ruling, such as misconduct of the jury, newly discovered evidence, excessive damages, error in the assessment of the amount of recovery, and similar questions. *The motion seems to serve no necessary purpose, as far as concerns the review on appeal of questions once submitted to, and decided by, the trial court.* It is true, if such questions are raised a second time, under the motion for new trial, the trial court may consider them, and may review its own rulings made at the trial to the extent of correcting them by granting a new trial. *But such review by the trial court is not necessary in order that questions once actually decided by it in the cause may be considered on appeal.*" (Italics ours.)

Respondent relies on certain general language appearing in *Westerland v. Argonaut Grill,* 185 Wash.

411, 55 P. (2d) 819, and *Hurst v. Peterson,* 189 Wash. 169, 64 P. (2d) 788, at variance with the above-cited rule. Those cases do not even mention any of the prior decisions which support the rule. In each of them, it was held that the evidence was sufficient to support the verdict of the jury and the judgment of the lower court was affirmed, but neither opinion indicates whether or not there was assigned as error the giving of, or the refusal to give, an instruction, or the admission or rejection of evidence. However, an examination of the briefs in the *Westerland* case discloses that the appellant therein did not urge questions involving the admissibility of evidence or the correctness of instructions, and no argument thereon was made. The briefs in the *Hurst* case likewise show that the question of the necessity of a motion for a new trial was not clearly raised, appellant therein being willing to concede (erroneously) that certain of his assignments of error would have to be dropped because a motion for a new trial was not made. Consequently, any statements in the *Westerland* and *Hurst* cases contrary to the well-established general rule must be regarded as dicta.

In the instant case, the appellant, having moved for a new trial and then waived the motion, is in the same position as it would have been had no motion for a new trial ever been made. It appears from the record that appellant interposed timely and sufficient exceptions to each of the three instructions on which it now assigns error. The questions as to their correctness were therefore duly presented to the trial court, and are now before us for determination on this appeal.

In instruction No. 3, the trial court told the jurors, in substance, that, if they found by a preponderance of the evidence that the defendant [appellant] telephone company "caused or permitted an excessive

amount of electricity to be upon the telephone line in question" and this resulted in shock and injury to the plaintiff wife [respondent], and if the company "failed to establish that it exercised due care and proper precautions under the circumstances and conditions, and then if, after considering the whole case and all the issues as to negligence, injury and damage, the evidence preponderates in favor of the plaintiff [respondent]," their verdict should be for the plaintiff [respondent].

Instruction No. 16 was to the effect that if it appeared by a fair preponderance of the evidence that the defendant [appellant] "negligently caused or negligently permitted a severe shock, electric impulse or tremendous vibration to pass over its telephone wires and into plaintiff's [respondent's] head and body, thereby proximately causing injury to her," then the jury's verdict should be for the plaintiff [respondent].

Appellant objects to the word "caused" in each of the two instructions. There is no evidence, appellant points out, that it caused any excess high voltage electricity to be introduced into its telephone system; and, hence, the instructions complained of permitted the jury to find appellant negligent on a theory not supported by the evidence.

The choice of the word "caused" in the instructions, under the circumstances, was not a happy one. It may be said, however, that the jury could very well have found that appellant "caused" the excessive electricity to "be upon the telephone line in question" (that is to say, the line extending into respondent's beauty parlor) and to pass into respondent's head and body, in the sense that appellant did not shunt it into the ground and keep it out by properly installing a protective device. But, aside from that, we do not think the two instructions in question, when considered in

connection with all the other instructions which the court gave, were prejudicial to appellant. (Instruction No. 25 admonished the jury to "consider the instructions as a whole and not pick out any particular instruction" for undue emphasis.)

As a whole, the instructions fairly and adequately stated the controlling issues and the applicable rules of law. Appellant's theories were presented fully and in a very favorable light. The court gave twenty-six instructions, of which eleven were adopted verbatim from the instructions proposed by the appellant, and two others were taken in substantial part from the same source. The jury was advised, for example, that the respondent had the burden of proving, by a fair preponderance of the evidence, that the appellant was negligent and such negligence was the cause of her injuries; that she was "required to prove that her damages and injuries were the proximate result of such negligence with reasonable certainty"; that, in order to recover, she must prove that her injuries "were due to and caused by some negligent act of the defendant [appellant]"; and that, in order to prevail, the respondent must not only show that "there were causes for which the defendant [appellant] would be liable which could have produced the injury," but she must also show "that it could not have been produced in any other manner except by causes for which the defendant [appellant] would be responsible."

In the light of these instructions and many others of similar import which the trial court gave, it is not likely that the jury was mislead, to appellant's detriment, by a rather loose use of the word "caused" in instructions No. 3 and No. 16. Even though detached expressions or statements in the court's charge to the jury may be technically erroneous, yet, if the instructions as a whole fairly state the law and do not mis-

lead the jury, there is no prejudicial error. *Carstens v. Earles*, 26 Wash. 676, 686, 67 Pac. 404; *Cheichi v. Northern Pacific R. Co.*, 66 Wash. 36, 118 Pac. 916; *O'Connell v. Home Oil Co.*, 180 Wash. 461, 465, 40 P. (2d) 991; *Forquer v. Hidden*, 191 Wash. 638, 645, 71 P. (2d) 1000; *American Products Co. v. Villwock*, 7 Wn. (2d) 246, 275, 109 P. (2d) 570.

Appellant also criticizes the court's instruction No. 17, because it referred to excessive electrical current entering defendant's [appellant's] telephone system "from a source *either known or unknown.* . . ." It maintains that there were only two possible sources of excess current, lightning and the transmission wires of a private power company, and, hence, there could not have been any *unknown* source. But if the jury found that the respondent received a severe electric shock through the telephone receiver and that the shock did not come from either of the two sources mentioned, then it could conclude, in effect, that the electricity in question came from an "unknown" source. As we have already pointed out, the evidence was such that the jury could so find. Instruction No. 17 was not erroneous.

Judgment affirmed.

ROBINSON, C. J., MAIN, STEINERT, and BLAKE, JJ., concur.