[No. 29710. *En Banc.* December 5, 1946.]

EVA M. EVANS, *Respondent,* v. METROPOLITAN LIFE INSURANCE COMPANY *et al., Appellants.*[1]

[1] Reported in 174 P. (2d) 961.

*Preston, Thorgrimson, Horowitz & Turner* and *Metzger, Blair & Gardner,* for appellants.

*W. W. Mount* and *John D. Carmody,* for respondent.

SIMPSON, J.—Two actions were instituted by plaintiff to recover upon insurance policies. One was against the Metropolitan Life Insurance Company. The complaint in that case alleged that December 1, 1925, the company issued its policy of life insurance to Leon R. Evans, and that plaintiff was named as beneficiary; that the company promised and

agreed to pay plaintiff the amount named in the policy in the event of the accidental death of the insured. In a second cause of action, plaintiff claimed that December 1, 1933, the company issued its policy of insurance to Leon R. Evans, in which it agreed to pay a certain sum to plaintiff named as the beneficiary therein, should Mr. Evans' death be caused by accidental means. A general allegation relating to the causes of action claimed that Leon R. Evans died by accidental means July 30, 1944.

In the second complaint, it was alleged that defendant, The Travelers Insurance Company, issued a policy of accident insurance to Leon R. Evans, July 8, 1938, and that plaintiff was named therein as the beneficiary. Allegations concerning the death of Mr. Evans were like those set out in the first-mentioned complaint.

The companies answered the complaints by denying that the death of Leon R. Evans was caused by accident. The cases were consolidated and tried to the court, sitting with a jury. The jury rendered a verdict in favor of plaintiff and against defendants.

At appropriate times, counsel for defendants moved for nonsuit, directed verdicts, and judgment n. o. v., or in the alternative for a new trial. Each of the motions was denied, and judgment entered upon the verdicts. Defendants then appealed to this court, where the cases have been consolidated for argument and consideration.

The assignments of error relate to the denial of the motions, and the action of the trial court in entering judgment upon the verdicts.

We shall italicize portions of the contracts and citations to give prominence to the dominant purposes thereof.

The undisputed facts are these: December 1, 1925, the Metropolitan Life Insurance Company issued to Leon R. Evans its insurance policy No. 1189285 A, payable in cash to respondent on death of insured. The policy in addition to the ordinary life insurance provisions, contained a provision for the payment to Mrs. Evans of double indemnity in the case of the accidental death of the insured. The pertinent

portions of the policy relating to death from accident provided:

"METROPOLITAN LIFE INSURANCE COMPANY

" . . . in consideration of SIX dollars and TWENTY-FIVE cents, payable ANNUAL as an additional premium herefor, such payment being simultaneous with, and under the same conditions as, the regular premium under the said policy, except as hereinafter provided,

"HEREBY AGREES to pay to the Beneficiary or Beneficiaries of record under said policy, in addition to the amount payable according to the terms of said policy, the sum of FIVE THOUSAND dollars, upon receipt, at the Home Office of the Company in the City of New York, of due proof of the death of the insured, *as the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means,* provided (1) that such death shall have occurred while said policy and this Supplementary Contract are in full force, and prior to the anniversary date of said policy nearest to the sixty-fifth birthday of the insured; and (2) that all premiums under said policy and this Supplementary Contract shall have been duly paid; and (3) that said policy shall not then be in force by virtue of any non-forfeiture provisions thereof; and (4) that death shall have ensued within ninety days from the date of such injuries; and (5) *that death shall not have been the result of self-destruction, whether sane or insane, or caused by or contributed to directly or indirectly, or wholly or partially, by disease,* or by bodily or mental infirmity."

The company paid the respondent all sums due in satisfaction of the ordinary life provisions contained in the policy.

July 1, 1933, the Metropolitan Life Insurance Company issued to Mr. Evans its "Monthly Premium Industrial Policy," No. 151990 M1 to Leon R. Evans. The provisions of that policy, in so far as this case is concerned, are:

"INDUSTRIAL POLICY ACCIDENTAL DEATH BENEFIT. Upon receipt of due *proof that the Insured,* after attaining age 15 and prior to attaining age 70, *has sustained,* after the date of this Policy, *bodily injuries, solely through external, violent and accidental means, resulting, directly and independently of all other causes,* in the death of the Insured within ninety days from the date of such bodily injuries while this Policy is in force, and while premiums are not in default beyond

the grace period specified in this Policy, the Company will pay in addition to any other sums due under this Policy and subject to the provisions of this Policy an Accidental Death Benefit equal to the face amount of insurance then payable at death, . . . In any case, the amount of the Accidental Death Benefit shall be reduced by the amount of any Disability Benefit which has become payable under this Policy on account of the same injuries as resulted in death.

*"No Accidental Death Benefit will be paid* if the death of the Insured is the result of self-destruction, whether sane or insane, nor *if death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily* or mental *infirmity."*

July 8, 1938, the Travelers Insurance Company issued a policy of accident insurance numbered M(1) 5315 to Mr. Evans. The policy contained the following provisions:

*" . . . against loss resulting directly and independently of all other causes from bodily injuries sustained during the term of this Policy and effected solely through accidental means, . . .*

*"The insurance under this Policy shall not cover hernia, nor shall it cover accident, injury, death, disability or other loss caused directly or indirectly, wholly or partly, (1) by bacterial infections (except pyogenic infections which shall occur through an accidental cut or wound), or (2) by any other kind of disease."*

On the face of the policy, there was printed the following statement:

"This Policy Provides Indemnity for Loss of Life, Limb, Sight, Time and Other Specified Losses Caused by Bodily Injuries Effected Through Accidental Means, to the Extent Herein Provided."

At the time of his death, Mr. Evans was sixty-one years of age, five feet eight inches tall, weighed one hundred fifty-five pounds, and was apparently in good health. He was employed by the city light department in the city of Tacoma. His duties compelled him to walk up and down stairs in going to and from his office on one of the upper floors of the city hall annex. He was accustomed to performing the usual duties about his home, which consisted mainly of mowing the lawn.

July 30, 1944, Mr. and Mrs. Evans attended church services, and then went by automobile to the Bryn Mawr apartments located on south Fourth street, about one-half block west of K street in the city of Tacoma. South Fourth street extends in an easterly and westerly direction, and intersects K street which runs in a northerly and southerly direction. The grade on south Fourth street is one and five-tenths per cent downward toward the west side of K street. There is a slight crown in the center of K street which rises two-tenths of a foot from the west boundary to its center. East of K street, the grade on south Fourth changes to ten and five-tenths per cent down.

After a stop at the apartment, Mr. and Mrs. Evans returned to the car, but the engine would not start. In order to get the engine to run, Mr. Evans released the brakes and started the car down towards K street by shoving with his foot on the pavement. The car drifted to the intersection of K street, where it was halted to avoid traffic proceeding southerly on that street. After the traffic cleared, Mr. Evans got out and pushed the car to the middle of K street, where they again halted to avoid traffic. (It is to be noted that the pull or push at this stage was slightly upgrade.) When the traffic had cleared, he started again and pushed the car the balance of the way across K street to a point on south Fourth street, where the steep descending grade started. Mrs. Evans, who had been in the driver's seat, brought the car to a stop, and Mr. Evans moved toward the door of the driver's seat. As he reached the door, he collapsed and, in a short time, ceased to live. The evidence shows that the automobile weighed four thousand one hundred fifty pounds.

A *post mortem* examination was performed by Dr. C. R. McColl. The autopsy was reviewed by Dr. Edwin W. Janes at the request of respondent. The death certificate, signed by Dr. W. W. Mattson gave as the "Immediate cause of death Coronary Thrombosis (sudden death) Due to Arteriosclerosis." Dr. McColl's diagnosis is shown by his autopsy report which reads as follows:

"HEART: There is an increase in fatty tissue in the parietal pericardium, also considerable fatty tissue in the visceral pericardium.

"The heart measures 11 cm. in the transverse diameter, 12 cm. in the long axis, and 6 cm. in the anterior-posterior diameter. The right coronary artery appears to be patent and pliable throughout, although there is a moderate arteriosclerosis near the proximal end. The right ventricular myocardium averages .3 cm. in thickness. The pulmonic and tricuspid valves show no marked pathological changes, although there is considerable post mortem degeneration of the tricuspid valve. There is an apparent moderate hypertrophy of the left ventricle the left ventricular myocardium averages 2.5 cm. in thickness. There is a marked rigidity of the mitral orifice which admits two fingers with ease. There is considerable calcification of the left coronary artery with an almost complete calcific occlusion of the first part of the anterior descending branch. There appears to be a fibrotic thickening of the leaflets of the mitral valve. There is no apparent shortening of the chordae tendineae. There are areas of fibrosis in the posterior wall of the left ventricle and also in the intra ventricular septum.

"The aorta shows no gross evidence of arteriosclerosis age considered."

"ANATOMICAL FINDINGS:

"1. Arteriosclerosis with almost complete occlusion of the anterior descending branch of the left coronary.

"2. Chronic myocarditis with scarring most marked in the left ventricle."

"MICROSCOPICAL:

"Liver:  .  .  . Diag: Cardiac cirrhosis.

"Heart: Chronic myocarditis with scarring. There is a fibrosis in and around the blood vessels.

"Coronary artery: Arteriosclerosis with areas of narrowing of the lumen."

Dr. Janes testified concerning the condition of the heart of the deceased. He stated that the left coronary vessels which supply the heart itself were very much thickened, and the lumen, that is, the inside of the vessel, was "very, very small," as compared with normal.

After being asked the following hypothetical question,

"Doctor Janes, assuming that Leon R. Evans, a man sixty-one years of age, was apparently in good health on and for some time before the 30th day of July, 1944, and that on

that day he pushed an automobile weighing over 4000 pounds a distance of approximately fifty feet across a public street and over a gradual rise of about two and a half inches to the center of said street and that immediately thereafter he collapsed and within a matter of minutes died, and considering the facts and conditions observed by you in the subsequent post mortem of the body of Leon R. Evans, what, in your opinion, was the cause of death?"

Dr. Janes testified as follows:

"I would answer that any individual of that age with a heart in that condition, the cause of death would be the excessive effort of pushing an automobile of that weight that distance over a slight crown, that is, in other words, the terrific effort called upon the heart."

He testified further:

"Q. *Doctor, would you say that this condition of occlusion that you found of long standing there, would you say whether or not that contributed to cause this man's death? A. It did. Q. Very definitely? A. It did. Q. And very materially? A. Yes. Q.* What about the condition of myocarditis, would you say that that contributed to his death? A. I do not think so. Q. That the occlusion was the real contributing factor? A. That is my judgment. Q. Doctor, assume that the condition of occlusion or narrowing of this artery had not been present in this man, would you say or did you find—strike—would you say then that the physical effort of moving the car would have caused any physical damage to this man? A. I would not think so, in view of what was found at the autopsy. Q. You answered, you would not think so? A. I would not think so. Q. With that condition of occlusion present that you found, what would you say as to whether or not other forms of exertion would probably have caused his death? A. I would say that severe exertion could have caused his death at any time. Q. Any severe exertion might have caused his death at any time? A. Any severe exertion might have caused his death."

On redirect examination, the doctor said:

"Q. Doctor, in answer to counsel's question you said that the occlusion you found contributed to his death; will you explain to the jury how, in your opinion, that contributed to his death and why it contributed to his death? A. Well, that condition contributed to his death in this way, that it blocked the circulation, that is, adequate circulation to

the heart muscle, whereas, if that condition had not existed during the strain there would have been adequate circulation to the heart muscle."

Dr. Mattson, who signed the death certificate, stated that he had read the report of Dr. McColl, and then testified:

"What, if anything, in this instance, would you consider the cause of death, sir? A. Heart strain. Q. Produced by what? A. By shoving the automobile over the street. Q. In your opinion, barring the ordinary uncertainty of human life, in your opinion, would the man have probably died at that time if it had not been for this over-exertion? A. Probably not."

Dr. McColl, specialist in pathology, testified:

"Pathology is that branch of medicine which treats of the essential nature of disease, especially of the structural and functional results of disease."

Asked to tell the jury what he found at the time he performed the autopsy, the doctor stated:

"A. Well, essentially what we found, that is, as a cause of death in Mr. Evans, there was an arteriosclerosis with almost complete occlusion of the anterior descending branch of the left coronary, that is the vessel which supplies the blood to the left ventricle to the heart, which is the part of the heart which causes the blood to circulate through the main portion of your body. And, with this there was what I call chronic myocarditis with scarring most marked in the left ventricle. In other words, in the muscular part of the heart there was a certain amount of scar tissue formed which is quite common in a heart which shows arteriosclerosis because that shows that previously to his death at some time there had been a lack of sufficient blood supply to that part of the heart which resulted in scar tissue and that scar tissue is no different than any other part of the body except it is more diffuse, and undoubtedly it was a heart condition. There were some other things that particularly showed up on the microscopical examination of the different tissues. For instance, there was passive congestion of the lungs which probably undoubtedly was due to the non-function of his heart at the time of his death. And, the liver showed what we call a cardiac cirrhosis which is a liver condition that is a usual thing with that individual who in the past has had some heart condition. And, his death was due primarily to the condition of the vessels of his heart. . . .

"Q. Now, is this condition, arteriosclerosis, one that comes on suddenly or is that one of some standing? A. Well, due to the nature of the disease itself it obviously is of long standing. For instance, this one vessel, particularly the wall of it, was greatly thickened due to the deposit of calcium and that is what causes the narrowing of the lumena of that vessel and it is the narrowing of the lumena which makes it difficult to give the heart a proper blood supply. It probably should be called a coronary insufficiency and it naturally is a progressive disease which eventually terminates— I should say is the usual thing. Q. Dr. McColl, state whether or not, in your opinion, a man with a heart condition such as you have described and which you found in Mr. Evans is likely to die from ordinary exertion? A. . . . anything that would cause that individual's blood pressure to rise, thereby causes more work for the heart and that heart would then need more blood supply and the coronary vessel being insufficient to furnish that, it might result in death."

On cross-examination, Dr. McColl testified:

"Assuming this in addition to what you found on your post mortem examination, that this man had pushed an automobile weighing 4150 pounds across "K" Street in Tacoma, the first 25 feet of it he pushed it over a rise, over the crown, we will say, two and a half inches or something like that, it is up hill that far, and then when he got it to the other side of "K" Street he collapsed and in a matter of minutes he was dead? (Did you consider that as having anything to do with his death?) A. The exertion, any exertion which would cause the rise of his blood pressure could be a possible precipitating factor. . . .

"Q. Is it not your opinion that that exertion acting on the particular heart condition that he had, did cause death? A. It was a factor in causing his death. . . .

"Q. Do you believe that the exertion superimposed on his condition may have caused his death? A. Yes. Q. Do you think that he was a man who, from his heart condition, did not have the normal power of resisting the effects of exertion? A. Yes. Q. And therefore, would be more apt to die from exertion than a man with a perfect heart? A. Yes, sir."

There are two questions to be considered in this case— First, do the facts as disclosed by the records show, or does any reasonable inference which may be drawn from them

prove, that Mr. Evans' death was the result of an accident; second, can it be held that the stipulated restrictions in the policies allow recovery in this case, and cases of like nature? Owing to the importance of the questions presented here, and the bearing this decision will have in the consideration of like cases arising in the future, we have deemed it necessary to make an extensive examination of the authorities and a complete analysis of the subject relating to contracts such as were made by appellants and Mr. Evans.

■ It is self-evident that (1) an insurance policy is merely a written contract between an insurer and an insured; (2) courts cannot rule out of the contract any language which the parties thereto have put into it; (3) a court is not at liberty to revise a contract under the theory of construing it; (4) neither abstract justice, nor any rule of construction, justifies the creation of a contract for the parties which they did not make themselves, or the imposition upon one party to a contract of an obligation not therein by him assumed. The words and terms as used in the contracts must be construed in their ordinary and popular sense.

■ "It is generally held that death or injury does not result from accident or accidental means within the terms of an accident policy where it is the natural result of the insured's voluntary act, unaccompanied by anything unforeseen, except the death or injury." 29 Am. Jur. 714, § 941.

In *Landress v. Phoenix Mut. Life Ins. Co.*, 291 U. S. 491, 78 L. Ed. 934, 54 S. Ct. 461, 90 A. L. R. 1382, the evidence showed the insured while playing golf was stricken with, and died shortly thereafter from, sunstroke. Recovery was sought under a policy of insurance containing the usual phraseology relative to accidental means. It was held that it is not enough to establish liability under such a policy, that the death or injury was unforeseen, unexpected, and an extraordinary result of a nonaccidental cause.

In *Maryland Cas. Co. v. Spitz*, 246 Fed. 817, L. R. A. 1918C, 1191, recovery was denied to the beneficiary for death of the insured under a policy, the pertinent provision of which was insurance against injury and death, "effected directly and independently of all other causes through ex-

ternal, violent, and accidental means." The evidence showed that the insured had been suffering from a boil on his neck. He had had the services of a doctor in treating this infection. While it was still healing, a healthy scab having formed to protect the wound, the insured, a butcher, deliberately scratched the affected area, breaking the scab and allowing dirt and filth from his hands to penetrate the area from which the scab had been removed. A few days later, the insured died of erysipelas. In considering the question of whether the means of death was accidental within the meaning of the above-quoted excerpt from the policy, the court had this to say:

"They do not mean simply that death shall be accidental; that is, unintended, or unexpected, or unforeseen; but that the means or the cause of death shall be accidental. . . . The words 'accident' and 'accidental' have been many times considered, and the numerous cases on this subject need not be reviewed. Their general meaning is not in doubt, and the Standard Dictionary's definition of 'accidental' will serve as well as another:

" 'Accidental: (1) Happening or coming by chance or without design; casual; fortuitous.'

"Accidental, therefore, is opposed to design, and a means is not accidental when it is employed intentionally, although it may produce a result not expected or intended."

*Fidelity & Cas. Co. of New York v. Stacey's Ex'rs.*, 143 Fed. 271, 6 Ann. Cas. 955, 5 L. R. A. (N. S.) 657, was an action based upon a policy of insurance providing indemnity against death resulting "directly, and independently of all other causes from bodily injuries sustained through external, violent and accidental means." According to the evidence, the insured, while in a fit of temper, assaulted an acquaintance and struck him twice in the face, sustaining a scratch or cut on the knuckle from contact with the teeth of his victim. Insured's death resulted from an infection commonly called "blood poisoning." The court, in determining that the death of the insured was not the result of accidental cause or means within the meaning of the policy, had this to say:

"There is a well-defined distinction between a death resulting from an accident and one resulting from accidental

means. As is well said in 3 Joyce on Insurance, § 2863, p. 208:

" 'A person may do a certain act the result of which act may produce unfor[e]seen consequences, and may produce what is commonly called accidental death, but the means are exactly what the man intended to use, and did use, and was prepared to use. The means were not accidental, but the result might be accidental.' "

In *Rock v. Travelers' Ins. Co.*, 172 Cal. 462, 156 Pac. 1029, L. R. A. 1916E, 1196, the evidence showed that the insured collapsed immediately after helping to remove a casket from the second floor to the ground floor of a home, in preparation for a funeral. The passageway traversed was very narrow, necessitating that only two men accomplish the intended removal. The facts further indicated that an autopsy revealed that acute dilatation of the heart was present, being the immediate cause of death. It was also indicated that an abnormal heart condition existed prior to the incident above related. There was unrefuted testimony to the effect that nothing of an exceptional nature occurred during the incident—that is, no slipping or sliding, or unexpected other happening.

The court stated:

"The policy, it will be observed, does not insure against accidental death or injuries, but against injuries effected by accidental means. A differentiation is made, therefore, between the result to the insured and the means which is the operative cause in producing this result. It is not enough that death or injury should be unexpected or unforeseen, but there must be some element of unexpectedness in the preceding act or occurrence which leads to the injury or death."

See, also, *Hutton v. States Acc. Ins. Co.*, 267 Ill. 267, 108 N. E. 296, Ann. Cas. 1916C, 577, L. R. A. 1915E, 127, and *Lickleider v. Iowa State Traveling Men's Ass'n*, 184 Iowa 423, 166 N. W. 363, 168 N. W. 884, 3 A. L. R. 1295.

The trial court in *Lehman v. Great Western Acc. Ass'n*, 155 Iowa 737, 133 N. W. 752, 42 L. R. A. (N. S.) 562, directed a verdict for the defendant, the insurer, in an action brought by insured to recover for injury under a policy of insurance limiting recovery "against the effects of personal bodily

injury caused solely by external, violent and accidental means." The decision of the supreme court affirmed the judgment. From the facts related, it appeared that the insured strained his side while bowling, a sport in which he engaged very frequently. The following day he was confined to his bed; a physician was called, who found tenderness of the muscles of the front and back of the abdomen; such tenderness, in his opinion, was due to strain. The next day, the insured developed a case of appendicitis, which the physician attributed to the irregular working of the abdominal muscles around the strained region. Two operations became necessary, so that insured was unable to carry on his vocational activity for more than four months, for which disability he sought compensation.

The court stated that the means was not external, violent, and accidental within the meaning of the policy, for there was

" . . . no evidence whatever of any slipping or falling, or of any straining of the muscles, other than the intentional strain put upon them in the voluntary and intentional act of bowling. Such a strain was not an accidental strain, and, if it produced an unintentional result and consequent injury, nevertheless the resulting injury, and not the means producing it, was accidental."

In *Feder v. Iowa State Traveling Men's Ass'n,* 107 Iowa 538, 78 N. W. 252, 70 Am. St. 212, 43 L. R. A. 693, the trial court entered judgment for the defendant on a directed verdict in an action to recover on a certificate of insurance issued by the defendant association providing indemnity for death "from any accidental cause." This decision affirms that judgment.

It was shown that insured at the time of his death resided in Denver, where he had been about nine months, having taken up residence there in order to benefit his health. The ailment from which he was suffering was "consumption." His death occurred immediately following his reaching over a chair and closing the shutters; as he did so, blood began to flow from his mouth. He expired a few · moments later. The cause of death was described as

hemorrhage from a ruptured artery. There was no evidence that he fell, slipped, lost his balance, failed to catch the shutter when he reached for it, or, in other words, no evidence that anything was done or occurred which he had not foreseen and planned, excepting the rupture of the artery and the consequences resulting therefrom.

The court discussed at length the definition of the word "accidental," quoting from a number of decisions among which is that from *United States Mut. Acc. Ass'n v. Barry,* 131 U. S. 100, 33 L. Ed. 60, 9 S. Ct. 755:

"The ordinary and popular meaning of the word 'accidental' is said to be 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected.' "

The court then made the following observation:

"While it may be true that an accident is an event which takes place without one's foresight or expectation, and is undesigned, it is not true that every unforeseen, undesigned, and unexpected event is an 'accident,' within the ordinary and popular meaning of that term. Thus, a person might voluntarily and knowingly expose himself to a contagious disease, or to excessive heat or cold, or to sudden changes of temperature, or might adopt a strange diet or mode of living; but, if death resulted, it would not be due to an accidental cause, although wholly undesigned, unforeseen, and unexpected. So, if a person suffering from some weakness or disease should subject himself to conditions which would not injuriously affect persons in ordinary health, but would be dangerous to him, and injury result, it would not be due to an accidental cause. For example, if a person having a diseased heart should take violent exercise voluntarily, and death should result, the cause would not be accidental."

The decision in *Salinger v. Fidelity & Cas. Co. of N. Y.,* 178 Ky. 369, 198 S. W. 1163, L. R. A. 1918C, 101, affirmed a judgment for the insurer in an action instituted by the insured under a policy insuring "against bodily injury sustained—through accidental means—and resulting *directly, independently* and *exclusively* of all other causes" in total or partial disability.

Insured was a merchant and, while in the act of lifting a box—total weight about twenty-four pounds—to a shelf

somewhat higher than his head, noticed that his vision was impaired. His attempt to rectify this condition by cleaning off his glasses, resulted in a discovery that he had completely lost the sight of one of his eyes. He was sixty years old, was in good health, and suffered no pain. Three medical men giving testimony after thorough examination of the insured substantially agreed that loss of sight was brought about by his bodily condition, and that it would not have been possible for him to lose his sight by the slight exertion he exercised, independently of his bodily infirmity. That infirmity was embolus, which is the technical term for a floating clot in the blood vessels. Blindness was caused by the lodging of this blood clot in the central artery of his eye, thus cutting off the blood supply and preventing circulation.

The court held that, while the result was unfortunate or accidental, the means of effecting that result was not accidental, as the term is commonly understood, within the meaning of the policy under consideration.

The facts in *Smith v. Travelers Ins. Co.*, 219 Mass. 147, 106 N. E. 607, L. R. A. 1915B, 872, indicated that the insured under a policy of insurance indemnifying against *"bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means"* and death resulting *"from such injuries alone"* (italics ours) died from spinal meningitis. The disease was caused, according to the evidence, from the presence of streptococcus germs in the brain. These germs, supposedly originally in the outer nose, had been carried into the middle ear through the Eustachian tube by a too violent inhalation of the nasal douche which the deceased was using for catarrh. From the middle ear, these germs had penetrated through a hole in the mastoid bone into the brain. The evidence also showed that the presence of a hole or perforation in the mastoid bone was a rare occurrence, being found in only one out of about a thousand skulls.

The court, in denying recovery, made this comment:

"But there was nothing accidental in the inhalation of this douche. The deceased did exactly what he intended to

do. This particular act of inhalation, though harder or more violent than usual, was not, so far as appears, harder or more violent than he intended it to be. There was no shock or surprise during the inhalation which made him draw a deeper breath than he intended to draw, nothing strange or unusual about the circumstances. The external act was exactly what he designed it to be, though it produced some internal consequences which he had not foreseen. Accordingly there was no bodily injury effected through a means which was both external and accidental. But it is only for a death resulting from injury effected through such means that the defendant is made responsible by the policy. It is not sufficient that the death or the illness that caused the death may have been an accidental result of the external cause, but that cause itself must have been, not only external and violent, but also accidental."

In *New Amsterdam Cas. Co. v. Johnson,* 91 Ohio 155, 110 N. E. 475, L. R. A. 1916B, 1018, the insured held an accident policy indemnifying him against bodily injuries effected *solely* and *exclusively* by *external, violent,* and *accidental means;* he suffered an injury due to dilation of the heart following the voluntary taking of a cold-water bath. The court held this injury was not compensable under the policy as caused by accidental means, there being no evidence that anything occurred which was not planned or anticipated, excepting the dilation and its consequences. In other words, the result might well be termed accidental under the common, accepted meaning of the term, yet that is not to say that the means was accidental, unless one chooses to subscribe to the theory that the result controls the means.

In *Stone v. Fidelity & Cas. Co. of N. Y.,* 133 Tenn. 672, 182 S. W. 252, Ann. Cas. 1917A, 86, L. R. A. 1916D, 536, it appeared that the insured, who had attended a football game on a cold damp day and contracted a cold, resulting in lumbago, and who, after medical treatment and the debility resulting from a purgative, while lying in bed had a paper brought, reached for it and raised it suddenly over his head, when his strong blood pressure caused a rupture of the retina, destroying the sight of one eye, could not recover on a policy insuring him against bodily injury through acci-

dental means; since, while the result was not foreseen, the cause producing the result was not accidental, but an ordinary, natural movement, executed as intended.

In *Schmid v. Indiana Travelers' Acc. Ass'n,* 42 Ind. App. 483, 85 N. E. 1032, it was held that death from circulatory failure and paralysis of the heart due to overexertion occasioned when the insured walked from the railroad depot to a hotel carrying luggage, was not compensable under an accident insurance policy indemnifying against physical bodily injury or death through external, violent, and accidental means.

The coverage clause in the policy under consideration in *Herthel v. Time Ins. Co.,* 221 Wis. 208, 265 N. W. 575, was somewhat broader than those commonly involved in the adjudicated cases, and insured against death resulting from "personal bodily injury . . . effected directly and independently of all other causes through accidental means, and which injury causes total and continuous inability to engage in any and every kind of business or labor." The phrases "through external violence" and "directly or indirectly," commonly found in contracts of this kind, do not occur in this policy. Evidence showed that the insured died immediately following the act of pulling a rowboat out of the water and onto the beach, an ordinary act which he had accomplished successfully on many prior occasions. An autopsy disclosed an existing heart ailment of long standing, the immediate cause of death being "acute cardiac dilation induced by overexertion in hauling boat out of water."

The court in denying recovery used this language:

"The general rule seems fairly deducible that, if a disease or bodily condition exists and an accident occurs, to constitute the accidental means the sole cause of an injury, under policies like the one in suit, it is not necessary that the injury or the results thereof would have been as severe as they were had the disease or bodily condition not existed; but it is sufficient if the accidental means would have solely caused some considerable injury had the disease or bodily condition not existed. But, if no considerable injury at all would have resulted had the insured not been afflicted with the existing disease or condition, the accidental means can-

not be considered as the sole cause of the injury. It is impossible to harmonize the cases stated. Some of them are contrary to the idea above expressed, but the great majority of them either support it or are not inconsistent with it.

"From the undisputed evidence in the instant case it is plain that no considerable injury to the insured would have occurred had he not been afflicted, at the time he sustained the injury to his heart, with the heart condition described. The heart condition must therefore be considered as a substantial factor in causing the heart injury that resulted in the death, and the accidental means found by the jury, assuming it to have been established, was not the sole cause of the heart injury that resulted in the death."

The supreme court of South Carolina in *Young v. Continental Cas. Co.*, 128 S. C. 168, 122 S. E. 577, held that it was error to have directed a verdict for the insured under a policy insuring against *"loss of life, limb, sight or time, resulting, without other contributing cause from personal bodily injury, which is effected solely* by the *happening of a purely accidental event"* (italics ours) when the evidence disclosed that the insured ruptured himself while reaching for a book on a shelf when standing on a store counter. He did not slip or fall while completing this maneuver. Shortly thereafter, he had the hernia condition corrected by an operation, for which resulting time loss recovery was sought. The court made this pronouncement:

"So, if a person suffering from some weakness or disease should subject himself to conditions which would not injuriously affect persons in ordinary health, but should be dangerous to him, and injury result, it would not be due to an accidental cause."

In *Pope v. Business Men's Assur. Co. of America,* 235 Mo. App. 263, 131 S. W. (2d) 887, it was held that, where insured's death allegedly resulted from driving his automobile over a muddy road and attempting to extricate it from mud, the acts of the insured were not accidental within the meaning of an accident policy insuring against death by accidental means. Under such a policy, it must appear that the means were accidental, and that it is not sufficient to warrant recovery that the result may be unusual, unex-

pected, or unforeseen; in other words, to qualify, the act preceding the injury must be attended by some slip, mishap, or unusual happening.

The court held in *Caldwell v. Travelers Ins. Co.*, 305 Mo. 619, 267 S. W. 907, 39 A. L. R. 56, that death attributable to unusual and unexpected obstruction of patient's bowels following a skillful operation performed, at his request, for hernia, is not within a policy insuring against death from bodily injuries effected directly and independently of all other means, through external, violent, and accidental means.

Additional cases holding that, to warrant a recovery under a policy against death or injury by accidental means, it must appear the means was accidental, and that it is not enough that the result was unusual, unexpected, or unforeseen, are: *Order of United Commercial Travelers of America v. Shane*, 64 F. (2d) 55; *Northam v. Metropolitan Life Ins. Co.*, 231 Ala. 105, 163 So. 635, 111 A. L. R. 622; *Losleben v. California State Life Ins. Co.*, 133 Cal. App. 550, 24 P. (2d) 825; *Szymanska v. Equitable Life Ins. Co.*, 37 Del. 272, 183 Atl. 309; *Provident Life & Acc. Ins. Co. v. Watkins*, 256 Ky. 645, 76 S. W. (2d) 889; *Parker v. Provident Life & Acc. Ins. Co.*, 178 La. 977, 152 So. 583; *Lawrence v. Massachusetts Bonding Co.*, 113 N. J. L. 265, 174 Atl. 226.

There is another line of cases which hold that, where the injury or death is the unusual, unexpected, or unforeseen result of an intentional act, such injury or death results from accidental means, although there is no proof of mishap, mischance, slip, or anything out of the ordinary in the act or event which causes the injury or death. However, we do not feel it necessary to analyze those cases for the reason that their holdings do not conform to the rule adopted by this court and by the majority of the courts of this country.

We shall now review our own cases in order to rectify some of the inconsistencies which have crept into them and to emphasize the rule which prevails in this state.

In *Horsfall v. Pacific Mut. Life Ins. Co.*, 32 Wash. 132, 72 Pac. 1028, 98 Am. St. 846, 63 L. R. A. 425, the facts as shown by the evidence in the case were that the insured, a strong,

healthy, robust man, weighing about one hundred eighty pounds, a blacksmith by trade, while at work was called upon to assist in lifting and carrying a piece of metal weighing in the neighborhood of four hundred fifty pounds. The insured made the lift from an awkward position due to the location of the burden, after which he suddenly became ill, turned ashen gray, perspired, trembled, and had to quit work. About twenty-five days later, he died from what was pronounced by the attending physician as violent dilation of the heart muscle. Doctors for both sides testified that such a lift would cause this effect.

The policy in question insured against the effect of bodily injuries "caused solely by external, violent, and accidental means." The court, in finding that insured's death was compensable under such a policy, said:

"Death by accident is defined to be ' "death from any unexpected event, which happens as by chance, or which does not take place according to the usual course of things." So a sprain of the muscles of the back, caused by lifting heavy weights in the course of business, is injury by accident or violence "occasioned by external or material causes operating on the person of the insured." ' "

This court held in *Carpenter v. Pacific Mut. Life Ins. Co.*, 145 Wash. 679, 261 Pac. 792, that an accident policy covering loss of life "resulting independently of all other causes, from bodily injuries effected through external, violent, and accidental means," covers the loss of a farmer's life from blood poisoning from infection in skinning a sheep while his hands were somewhat abraded.

The court turned the case on the rule declared in *United States Mut. Acc. Ass'n v. Barry*, 131 U. S. 100, 33 L. Ed. 60, 9 S. Ct. 755:

" 'The term "accidental" was used in the policy in its ordinary, popular sense, as meaning "happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;" that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected,

unusual occurs which produces the injury, then the injury has resulted through accidental means.' "

This is the rule seized upon by the exponents of both sides of this controversy; those aligned on the side of "accidental results" choose to be guided by a selected phrase from this rule in forming their conclusion, whereas, the exponents of the "accidental means" line of cases choose to found their conclusions on the rule taken in its entirety, which gives the definite impression that, to constitute *"accidental means,"* the fortuitous event must occur concurrently with the act that precedes the injury; in other words, some slip, mischance, or other unfortunate event unintended along with the voluntary act.

Clearly, here was a case of an unusual, unexpected, and unforeseen event accompanying the voluntary act prior to the injury—the blood poisoning infection—so that the injury might be said to be accidental means.

In *McNally v. Maryland Cas. Co.,* 162 Wash. 321, 298 Pac. 721, it was held that the drinking of wood alcohol by mistake while insured was supposedly drinking Scotch whisky, resulting in serious disability, was an "accident" within the terms of a policy insuring against bodily injury due to accidental means. The court, quoting from *Zurich General Acc. & Liability Ins. Co. v. Flickinger,* 33 F. (2d) 853, 68 A. L. R. 161, which cited the rule of the *Barry* case, said:

" ' "If in the act which precedes the injury something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted through accidental means." ' "

and then continued:

" 'Here the act which preceded the injury was the drinking of the supposed intoxicating beverage. And the thing which was "unforeseen, unexpected or unusual" therein was the fact that it contained wood alcohol, a deadly poison. In other words, there was the unintentional and unexpected drinking by insured of a poisonous substance.' "

The court in *Hanley v. Occidental Life Ins. Co.,* 164 Wash. 320, 2 P. (2d) 636, held that death was by accidental means within the meaning of a policy of accident insurance when it resulted from septic pneumonia caused by an infected

portion of the blood vessel surrounding an accidental leg injury becoming detached and lodging in insured's right lung. It was the initial leg injury that produced the leg infection, such injury being the proximate cause of death.

In *Kearney v. Washington Nat. Ins. Co.,* 184 Wash. 579, 52 P. (2d) 903, this court held that blindness was caused by accident within the meaning of a policy insuring against injury or death by accidental means when it was the result of insured's falling down a flight of stairs while on his rounds as a watchman, even though at the time he was suffering from existing diseases which contributed thereto after being precipitated by the fall.

It was held in *Hill v. Great Northern Life Ins. Co.,* 186 Wash. 167, 57 P. (2d) 405, that it was a question for the jury to decide whether death was due to a cerebral hemorrhage induced by shock resulting from an *automobile accident,* or whether it resulted from existing *coronary trouble.* There was no direct evidence of traumatic injury. The jury found death attributable to the accident, the cerebral hemorrhage being a result caused by shock attendant upon the automobile collision.

This court in *Hemrich v. Aetna Life Ins. Co.,* 188 Wash. 652, 63 P. (2d) 432, held that death was within the compass of a policy insuring against loss by accidental means where insured died from thrombosis of the pulmonary artery, the thrombi originating in the region of leg fracture. The insured sustained a broken leg when he slipped and fell on the sidewalk. In affirming the correctness of an instruction given by the trial court, this court said:

"The effect of the language in the instruction complained of is that, if the jury find that the accident set in motion some latent physical defect or commenced systemic disorders, *and that the insured died as a result of the accident causing such disorders,* they should find that the insured's death was caused by reason of the accident, within the meaning of the policy. Surely, the instruction is right. If the accident caused a change in or upon the body of the insured that caused his death, manifestly the accident was responsible for the death."

In the case of *Kane v. Order of United Commercial Travelers,* 3 Wn. (2d) 355, 100 P. (2d) 1036, the insured received injuries from an accidental fall which aggravated an existing hernia and necessitated a surgical operation. He made good recovery until he contracted lobar pneumonia, from which he died. The court held

". . . that, when death results from disease which follows as a natural though not necessary consequence of an accidental injury, it is within the terms of the accident certificate, the death being deemed the proximate result, not of the disease as an independent cause, but of the injury."

In *Zinn v. Equitable Life Ins. Co. of Iowa,* 6 Wn. (2d) 379, 107 P. (2d) 921, it was held that death was by "external, violent, and accidental means" within the meaning of the policy where the insured died from blood poisoning following the lancing of his arm by a physician in order to relieve an existing high blood pressure condition. After recognizing the two distinct lines of thought on this question and citing numerous cases in support of both contentions, the court had this to say:

"After a consideration of the authorities cited, including our own cases, we hold that death is accidental, within the meaning of the provisions of insurance policies such as we have in the case at bar, where death occurs as the result of unusual, unexpected, or unforeseen events following an intentional act, provided that those events are not normally effected."

In *Pierce v. Pacific Mut. Life Ins. Co. of Calif.,* 7 Wn. (2d) 151, 109 P. (2d) 322, under a policy insuring against bodily injury sustained "solely through accidental means," it was held that injury consisting of cerebral hemorrhage or "stroke" caused by fright and shock induced by apparent imminent danger of an automobile collision, was an injury resulting "directly, independently and exclusively of all other causes" within the meaning of the insurance contract. Insured's prior state of health, that of arteriosclerosis and high blood pressure, was but a condition, and not a concurring cause. The court had this to say:

"The terms 'accident' and 'accidental means,' as used or referred to in insurance policies, have been variously defined, . . . All of the definitions include the idea that the means as well as the result must be unforeseen, involuntary, unexpected, and unusual; that it must be a happening by chance."

The case here under consideration differs from the *Pierce* case in that, while appellant in that case had a diseased condition which deprived him of the normal power of resistance to the effects of undue strain or fright, the impending automobile collision, involuntary, unexpected, and unusual, was deemed the predominant factor in the production of the result; whereas, in the case at bar, the arteriosclerosis had reached a virulent stage and was an active cause of death. That situation brings the present case within the exceptions contained in the policies.

In *Graham v. Police & Firemen's Ins. Ass'n,* 10 Wn. (2d) 288, 116 P. (2d) 352, the insured fell down the basement steps upon the cement floor below while rushing to the aid of his minor daughter, whose clothes had caught on fire in the basement of his home. Insured sustained a broken foot and severe shock as a result of this fall, and severely burned his hands in extinguishing the fire. Insured was a fireman by profession and had been suffering for some time prior to this incident from angina pectoris. Shortly after this fall, the insured died from what those performing the autopsy described as coronary thrombosis. It was held that death was from "external, violent and accidental means" within the meaning of the policy, under which recovery was had.

The evidence in *Hodges v. Mutual Benefit Health & Acc. Ass'n of Omaha,* 15 Wn. (2d) 699, 131 P. (2d) 937, disclosed that the insured suffered a coronary thrombosis while dancing. He died a few hours later. Prior to this incident, insured had been healthy and had labored on construction work. Recovery was denied under a policy insuring against "bodily injuries sustained . . . through purely accidental means," the court stating:

"In the case at bar, the insured was doing an ordinary and customary act in his usual way and no unexpected event

interposed itself to cause injury. The dance was described as a fast fox trot. That dance, so far as the facts indicate, was no different from any other modern lively dance and called for no violent action other than that which was incident to the activity of dancing and readily foreseeable by the insured. The insured's death was not caused by an unexpected event which happened by chance."

Recovery was sought in *Crowell v. Sunset Cas. Co. of America*, 21 Wn. (2d) 238, 150 P. (2d) 728, for death of the insured under a policy providing for payment of the principal sum in case of death of the insured as the result of accident. Evidence introduced showed that the insured was a fireman at a sawmill. On the day of his death, he was observed coming from the boiler room with his face upturned, the witness approached to assist him, observing that he was acting abnormally. The insured collapsed in the arms of the witness and died on the way to the hospital. An autopsy was performed disclosing "almost complete coronary occlusion, the result of advanced arteriosclerosis," and, in the opening of the artery, a thrombus or clot. In the opinion in which recovery was denied, it was stated:

"In the case last cited [*Graham* case, *supra*], as in the other cases relied upon by respondent, the evidence disclosed some definite particular occurrence or event which supported a holding by the trier of the fact that the death of the insured was the result of an accident. In the case at bar, the only occurrence relied upon by respondent to support the judgment in her favor was the fact that on the day he died Mr. Crowell was working harder than usual. One working as a fireman, as was Mr. Crowell, naturally works harder some days than others. The record contains no evidence that any one particular event occurred requiring unusual exertion on the part of the insured, which might have brought about his death. Mr. Crowell's work required considerable physical exertion every day. He had filled the position of fireman for almost nine years. Under such circumstances, a hard day's work at the usual occupation of firing a steam plant cannot be considered an accident.

"This conclusion is supported by the recent case of *Hodges v. Mutual Benefit Health & Accident Ass'n*, 15 Wn. (2d) 699, 131 P. (2d) 937, which was also a suit upon a policy of accident insurance."

The opinion then analyzes the case, quoting at length therefrom, and then continues:

"In the case at bar, as in the *Hodges* case, no accident is shown. An affirmance of the judgment appealed from would be equivalent to a holding that any exertion, normal in nature, but greater than average, or strain due to such continued exertion, would, if resulting in such a condition as that which occasioned Mr. Crowell's death, constitute an accident within the meaning of such a policy as that now before us. The law does not support such a holding. . . . There is no evidence suggesting the intervention of any unforeseen or even unusual agency or event. . . .

"Respondent failed to prove that the injured had suffered from any accident, and failed to bring her claim within the coverage of the policy."

This court in *Bennett v. Mutual Trust Life Ins. Co.*, 21 Wn. (2d) 698, 152 P. (2d) 713, reversed a judgment entered after verdict of a jury in favor of the plaintiff, as beneficiary under an accident insurance policy, on the ground that a certain instruction was erroneous. The court sent the case back for a new trial.

The facts indicated that the insured was a powerfully built man who was a professional fireman in the city of Yakima. He in fact held the rank of lieutenant in the department. The accident relied upon occurred while the insured was demonstrating to some new recruits the operation of a ladder. It appeared that ordinarily three men were used in raising this particular ladder; however, the insured demonstrated that under emergent circumstances two men could successfully raise it. Some two or three days later, it was discovered that he had suffered a hernia. Shortly thereafter, an operation was advised and performed to correct this condition. While the operation was a success from the standpoint of technique, the patient died on the operating table. A *post mortem* examination was had, those conducting it reporting that death was due more *probably* to cerebral hemorrhage than to any other cause.

The court stated that what the autopsy disclosed was immaterial,

" . . . for, if an accident may be said to be the proximate cause of death, the stipulation contained in the policies is met; in other words, it is unnecessary to determine the precise pathological condition or change which occurred if death is the proximate result of an accident."

The court then continued in this manner:

"This court has long been committed to the rule 'that death is accidental, even though the means are intentional, where the results are unusual, unexpected, or unforeseen.' *Zinn v. Equitable Life Ins. Co.*, 6 Wn. (2d) 379, 384, 107 P. (2d) 921. See, also, *Horsfall v. Pacific Mutual Life Ins. Co.*, 32 Wash. 132, 72 Pac. 1028, 98 Am. St. 846, 63 L. R. A. 425; *Hanley v. Occidental Life Ins. Co.*, 164 Wash. 320, 2 P. (2d) 636; *Kearney v. Washington Nat. Ins. Co.*, 184 Wash. 579, 52 P. (2d) 903; *Hemrich v. Aetna Life Ins. Co.*, 188 Wash. 652, 63 P. (2d) 432.

"So, the fact that the insured sustained the hernia as a result of his voluntary act of raising the ladder alone makes the injury nonetheless 'accidental.' Bearing this principle in mind, we think our decision in *Kane v. Order of United Commercial Travelers of America*, 3 Wn. (2d) 355, 359, 364, 100 P. (2d) 1036, by reason of analogy in the facts, is controlling in the instant case:

" ' . . . We hold, therefore, that, when death results from disease which follows as a natural though not necessary consequence of an accidental injury, it is within the terms of the accident certificate, the death being deemed the proximate result, not of the disease as an independent cause, but of the injury.' "

In the *Carpenter* case, the skinning of the sheep was a deliberate, intentional act, while the infection was the unforeseen, intervening cause which brought about the death of the insured.

The insured in the *McNally* case intended to drink intoxicating liquor and by mistake drank wood alcohol. The accident which caused the death was not the drinking, but the mistake in consuming the alcohol.

Death in the *Hanley, Kearney, Hill,* and *Hemrich* cases was the direct result of pure accident.

In the *Zinn* case, the accident which caused death was not the lancing of insured's arm, but was the unusual, unexpected, and unforeseen introduction of staphlococcus

germ into the incision made by the doctor when he deliberately drew blood from the arm of the insured.

The injury suffered by the insured in the *Pierce* case was not caused by the driving of the automobile, but the fright caused by the unexpected and imminent danger of a collision with another automobile brought about the injury to the insured.

The accident in the *Graham* case was the unexpected fall down a flight of stairs, and not the act of running down those stairs.

In this case, the pushing of the automobile was the means by which the injury was caused, and there was nothing unforeseen, involuntary, or unexpected in the act in which the insured was engaged from the time he started his car by pushing his foot on the pavement until he collapsed. There was no stumbling, slipping, or falling in his movements. He engaged in pushing his automobile for his own convenience. He encountered no obstacle in doing so. He accomplished just what he intended to in the way he intended to, and in the free exercise of his choice. No accident of any kind interfered with his movements, or for an instant relaxed his self-control. There was an unforeseen result of the insured's deliberate actions. The *result* of any action, however, cannot be considered in the determination of the question of whether there was an accident.

The conclusion we must reach from a consideration of all the cited cases is that accident is never present when a deliberate act is performed, unless some additional, unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death.

It will be noted that the above conclusion is contrary to the decisions in the *Horsfall* and *Bennett* cases. Those cases are therefore overruled.

The evidence of the doctors, the pertinent portions of which are set out in this opinion, was to the effect that the condition of the insured's heart contributed to his death. The term "proximate cause" has no application in ascertaining liability upon policies which contain clauses relieving the insurance companies from liability in cases where death

is caused or contributed to directly, or indirectly, or wholly or partially, by disease, and the evidence showed that the disease contributed to the death. Where the liability of the insurance company is so restricted, it is not sufficient for a beneficiary to establish a direct causal connection between the accident and the injury. He is compelled to show that the resultant condition was caused solely by accidental means; and, if the proof shows a preexisting infirmity which was a contributing factor, he cannot recover. This holding is dictated by the express terms of the contracts under consideration.

However, if it be found that disease, while existing, be but a condition, and the accident the sole and proximate cause of death, the exception in the policy will not relieve for death so caused. This distinction is illustrated in the *Graham* case. In that case, the insured had a disease of the heart at the time he was injured by falling down a flight of stairs. A doctor stated that insured's death was the result of accidental injury, and had it not been for the accidental fall, in all probability he would have been alive at the time the case against the insurance association was tried. The fact that the insured's physical condition was impaired did not deprive the accident of its distinction as the sole producing cause of injury. In such cases, disease does not arise to the dignity of a concurring cause which produces injury or death, though it may be a passive ally.

Decisions upon this question are numerous, and we will have to content ourselves with calling attention to but a small number of them.

In *Day v. Great Eastern Cas. Co.*, 104 Wash. 575, 177 Pac. 650, this court adopted a rule relating to policies similar to those in the case at bar, by approving the following holding of the Minnesota supreme court in *White v. Standard Life & Acc. Ins. Co.*, 95 Minn. 77, 103 N. W. 735, 884:

" 'Similar policies have been before both the state and federal courts, and the consensus of judicial opinion is that, subject to the exceptions contained in the policy, if the injury is the proximate cause of death, the company is liable, *but, if an injury and an existing bodily disease or infirmity concur and co-operate to that end, no liability exists. If,*

however, the injury be the cause of the infirmity or disease —if the disease results and springs from the injury—the company is liable, though both co-operate in causing death. The distinction made in this particular is found in that class of cases where the infirmity or disease existed in the insured at the time of the injury, and, on the other hand, that class of cases where the disease was caused and brought about by the injury. And even in cases where the insured is afflicted at the time of the accident with some bodily disease, if the accidental injury be of such a nature as to cause death solely and independently of the disease, liability exists.' "

The facts in *Davis v. Jefferson Standard Life Ins. Co.,* 73 F. (2d) 330, 96 A. L. R. 599, showed that the policy of insurance under consideration in that case excepted payment when death resulted "directly or indirectly from bodily or mental infirmity." The insured died from the effects of an abdominal operation made necessary by an automobile accident. The surgeon testified that death was due to the anesthetic and insured's weak heart. In passing upon the legal question presented, the court said:

"Insurance against death by accident is usually afforded for a small premium, and the coverage is correspondingly narrow. The liability is guarded by carefully chosen words. Courts have no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than they would have to increase the amount of the insurance. The insurance here is not against unintended death from bodily injury effected by violent, external means generally, but only when the violent, external means can be said to be accidental and when they solely and independently of all other causes produce the death. If a bodily infirmity, though unknown at the time, is a concurring cause without which death would not have resulted, the policy does not cover the case."

In *Budzinski v. Metropolitan Life Ins. Co.,* 287 Mich. 495, 283 N. W. 662, 286 N. W. 842, it appears that two policies of insurance were issued to an individual. One policy provided:

"The additional accidental death benefit shall not be payable if the insured's death results . . . directly or indirectly from infirmity of mind or body; from illness or disease, or from any bacterial infection other than bacterial

infection occurring in direct consequence of accidental and bodily injuries."

The other policy insured against death resulting

" . . . directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means,"

but not if death was

" . . . the result of . . . or caused by or contributed to directly or indirectly or wholly or partially by disease or by bodily or mental infirmity."

The evidence showed that the insured suffered an injury to his finger. The resulting pain caused a blood vessel to burst in his brain. The proof further showed that the injured had been afflicted with cerebral arteriosclerosis in a marked degree, and that the increased blood pressure, occasioned by the severe pain, caused a rupture resulting in death. It was conceded that, had it not been for the disease, the injury would not have caused the death. The court held the company liable but, on rehearing (286 N. W. 842), adopted the dissenting opinion, which reads:

"I am not in accord with the views of Mr. Justice Chandler. The policies provide for the payment of an additional sum of $1,000 upon receipt of due proof that death of the insured has resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means. Clause two of the policies provides that the additional accidental death benefit shall not be payable if the insured's death results directly or indirectly from infirmity of mind or body; from illness or disease.

"In this cause the plaintiffs admit and the undisputed medical evidence shows that the injury suffered by deceased would not have caused his death except from the sclerotic condition of the blood vessels.

"In *Sturgis National Bank v. Maryland Casualty Co.,* 252 Mich. 426, we said:

" 'The court will not make a new contract for parties under the guise of a construction of the contract, when in doing so it will ignore the plain meaning of words.'

"In *Fidelity & Casualty Co. v. Meyer,* 106 Ark. 91 (152 S. W. 995, 44 L. R. A. [N.S.] 493), the court said:

" 'It is the duty of courts to give such construction to a policy, if the language used fairly admits, as will make it of some substantial value and carry out the intention expressed therein that liability is incurred where death occurs from accidental injury. If liability is to depend upon the physical condition of the assured as contributing in some degree to death, then it should be so stated plainly in the policy.'

"From my examination of clause two of the policies, I am constrained to hold that there is no liability in the instant cases as bodily infirmity or disease was a contributing cause of the assured's death. The policies are unambiguous and admit of no other construction."

The supreme court of Michigan in the case of *Bristol v. Mutual Ben. Health & Acc. Ass'n*, 305 Mich. 145, 9 N. W. (2d) 38, reaffirmed the final decision in the above-cited case by stating:

"The important question in the case is whether the presence of a terminal disease at the time of a fatal accident bars recovery. In those instances where several causes concur to produce death, the answer depends upon the language of the policy. If the insuring clause is similar to that in the policy herein relied upon, and each claim can be supported by competent evidence, the decision of the jury is controlling. *Hoff v. Mutual Life Insurance Co.*, 266 Mich. 380; *Kangas v. New York Life Ins. Co.*, 223 Mich. 238. If the policy expressly excludes liability for death resulting directly or indirectly from bodily infirmity, illness, or disease, the accident itself must have been sufficient to cause death. *Rathman v. New Amsterdam Casualty Co.*, 186 Mich. 115 (L. R. A. 1915 E, 980, Ann. Cas. 1917 C, 459); *Budzinski v. Metropolitan Life Ins. Co.*, 287 Mich. 495."

Again, we find the following language in *First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of United States*, 225 Ala. 586, 144 So. 451:

"Authorities following the doctrine of concurring causes, we believe, uniformly and logically deny liability where, as here, there is an additional clause excluding cases wherein the death results 'directly or indirectly from disease or bodily infirmity,' provided such disease or infirmity was an efficient cause of death. [Citing cases.]

"Finally, cases construing the general coverage clause in line with our cases, and applying the same doctrine of prox-

imate cause thereto, either differentiate same from policies expressly excluding death 'resulting directly or indirectly from disease or bodily infirmity,' or terms of similar import, or had no occasion to do so. [Citing cases.]

"It seems, therefore, the great weight of authority supports the views expressed in our cases, viz. where there is special provision directing the attention of the insured to disease or bodily infirmity, and expressly excluding liability in case of death resulting directly or indirectly therefrom, some effect must be given to such provision; and liability denied in cases of like character as our *Hoehn* and *Armbruster* Cases."

The sole question presented in *Adkins v. Metropolitan Life Ins. Co.*, 235 Ala. 417, 179 So. 382, was whether death caused by heatstroke was accidental where it appeared that the insured's death was contributed to by Addison's disease. In passing upon the question presented, the court decided:

"Moreover, the policy contract in the instant case contains this provision, excluding liability: Provided, '5. That death shall not have been the result of self-destruction, whether sane or insane, *or caused by or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity.*' The provision of the policy italicized was pleaded in defense of the action. The evidence, without conflict, shows that at the time it is alleged the insured suffered the heatstroke he was suffering from Addison's disease, a fatal disease, and that this disease was an efficient, proximate contributing cause of the death of the insured. This plea of the defendant being proved by the uncontroverted evidence in the case, and without any sort of conflict, the defendant was also due the general charge on this phase of the case. *First Nat. Bank v. Equitable Life Assur. Society*, 225 Ala. 586, 144 So. 451."

The accident insurance policy construed in *Kingsland v. Metropolitan Life Ins. Co.*, 97 Mont. 558, 37 P. (2d) 335, contained a restrictive clause which absolved the company from liability if death was caused or contributed to directly or indirectly or wholly or partially by disease or bodily or mental infirmity. In that case, the court held:

"Thus, by the contract of the parties which we are called upon to interpret and enforce, a reasonable scope of insurance is contemplated, but by clear and unequivocal lan-

guage it is likewise contemplated 'that the insured might suffer an accident resulting in death, to which disease or bodily infirmity contributed indirectly or partially; and, if so, such death was within the exception.' (*Sullivan v. Metropolitan Life Ins. Co.*, 96 Mont. 254, 29 Pac. (2d) 1046.)"

Accord: *Prudential Ins. Co. v. Calvin,* 227 Ala. 146, 148 So. 837; *Federal Life Ins. Co. v. Firestone,* 159 Okla. 228, 15 P. (2d) 141; *Great Northern Life Ins. Co. of Milwaukee v. Farmers' Union Co-operative Gin Co.,* 181 Okla. 370, 73 P. (2d) 1155; *Sullivan v. Metropolitan Life Ins. Co.,* 96 Mont. 254, 29 P. (2d) 1046; *Kellner v. Travelers Ins. Co. of Hartford,* 180 Cal. 326, 181 Pac. 61; *Bouchard v. Prudential Ins. Co. of America,* 135 Me. 238, 194 Atl. 405; *O'Meara v. Columbian Nat. Life Ins. Co.,* 119 Conn. 641, 178 Atl. 357; *Clark v. Employers' Liability Assur. Co.,* 72 Vt. 458, 48 Atl. 639; *Runyon v. Commonwealth Cas. Co.,* 109 N. J. L. 238, 160 Atl. 402; *Korff v. Travelers Ins. Co. of Hartford,* 83 F. (2d) 45.

The eminent trial judge placed great reliance upon *Kearney v. Washington Nat. Ins. Co.,* 184 Wash. 579, 52 P. (2d) 903, and depended upon his interpretation of that case in denying the motion for judgment notwithstanding the verdict. He concluded that the decided case allowed recovery in policies similar to those in the present case where disease was a contributing factor of death. We do not so consider the opinion, though some of the words therein lend support to the conclusion reached by the trial court. The facts in that case (and the facts in any case make the law, or in any event call for the application of certain legal principles) were in dispute. The insured had a policy in the National Insurance Company which provided that, in order to recover thereunder, the bodily injuries must be through external, violent, and accidental means, and not directly or indirectly from any other cause, or causes. At the time he was injured by falling down a flight of stairs, he had some physical infirmities. On the part of the insurance company, the evidence showed that his injury was not the result of a fall, but that the fall was occasioned by arthritis and arteriosclerosis. On the other hand, the testimony presented by

the beneficiary was that the injury was due to the fall. It will be seen from the recital of the facts that there was a question presented to the jury as to whether or not the fall was occasioned by disease, or by pure accident. Therefore, the cited case has no bearing upon the questions presented in this case.

For the reasons given in this opinion, we reverse the judgment of the trial court, with instructions to dismiss the action.

STEINERT, ROBINSON, JEFFERS, and MALLERY, JJ., concur.

CONNELLY, J. (dissenting)—I dissent. I am unable to perceive any substantial distinction in law between the instant case and *Pierce v. Pacific Mut. Life Ins. Co. of Calif.*, 7 Wn. (2d) 151, 109 P. (2d) 322. In the *Pierce* case, the plaintiff was suffering from a preexisting chronic heart ailment. While driving his car, he was suddenly confronted with an impending automobile collision. The resulting fright caused him to suffer an immediate cerebral hemorrhage. In the present case, there was a preexisting chronic heart condition and a strain, induced by Mr. Evans' pushing his automobile upgrade and across the street, from which he immediately thereafter collapsed and died.

Can the preexisting diseased condition of Mr. Evans' heart have less bearing upon the language of the policies than did the preexisting diseased condition of Mr. Pierce's heart and circulatory system? Or, is it the suddenness and unexpectedness of the fright, strain, trauma, or inducing cause, resulting in a stoppage of the functions of the diseased heart, which must control the interpretation of the language of the insurance policies?

In the *Pierce* case, the policy insured

" ' . . . against Bodily Injury sustained . . . solely through accidental means . . . and resulting directly, independently and exclusively of all other causes, in—
" '(A) Immediate and continuous total disability that prevents the Insured . . . from performing any and every kind of duty pertaining to his occupation, . . .' "

Pierce was incapacitated on December 6, 1938, and for ten or fifteen years prior to that time he had been afflicted

with arteriosclerosis and hypertension, and six years previously he had suffered a slight cerebral hemorrhage which had required hospitalization for six days. To use the language of the court in that opinion:

"He recovered from that attack, however, to the extent that he was able to resume his usual work as a lawyer, although he continued to have arteriosclerosis and high blood pressure. He was accordingly advised by his physician to avoid stress and strain, inasmuch as a person in his condition is more susceptible to cerebral hemorrhage than is a normally healthy person."

In that case, also, this court said:

"The mere fact that hypertension and arteriosclerosis render one more susceptible to cerebral hemorrhages, is clearly not determinative of the question. If such were not the case, *the benefits of accident insurance would be available to those in perfect health only,* for in every instance it could well be argued that, were it not for the weakened condition of the individual, the disability would not have resulted or, else, would have been less pronounced." (Italics mine.)

We held squarely in that case that Mr. Pierce's diseased heart was but a condition and not a concurring cause of his injury. We quoted with approval from *Driskell v. United States Health & Acc. Ins. Co.,* 117 Mo. App. 362, 93 S. W. 880, to the same effect.

Turning to the complaints in the cases before us, it will be noticed that, in the first cause of action against the Metropolitan Life Insurance Company, the controlling clause in the policy recites as follows:

". . . (5) that death shall not have been the result of self-destruction, whether sane or insane, or caused by or contributed to directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity; . . ."

The applicable provision of the policy referred to in the second cause of action against Metropolitan Insurance Company is as follows:

"No Accidental Death Benefit will be paid if the death of the Insured is the result of self-destruction, whether sane or insane, nor if death is caused or contributed to, di-

rectly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity."

The Travelers Insurance Company policy, which constituted the basis of a separate cause of action by respondent, but is consolidated here with respondent's suits against the Metropolitan Insurance Company, provides, in its applicable portion, as follows:

" . . . against loss resulting directly and independently of all other causes from bodily injuries sustained during the term of this Policy and effected solely through accidental means, . . .

"The insurance under this Policy shall not cover hernia, nor shall it cover accident, injury, death, disability or other loss caused directly or indirectly, wholly or partly, (1) by bacterial infections (except pyogenic infections which shall occur through an accidental cut or wound), or (2) by any other kind of disease."

Evans fell dead immediately following an undue and violent strain induced by pushing his stalled automobile across one of the streets of Tacoma. An autopsy examination showed a diseased heart condition specified as:

"1. Arteriosclerosis with almost complete occlusion of the anterior descending branch of the left coronary.

"2. Chronic myocarditis with scarring most marked in the left ventricle."

The fundamental rule of liberal construction of the insurance policy in favor of the assured and his beneficiaries should apply in the present case. It was applied in the *Pierce* case, *supra*. Certainly, there is no distinction—medically, factually, or legally—between the two cases. Evans collapsed immediately after he had pushed his automobile across the street. Mr. Pierce collapsed mentally at the instant that he perceived the imminent collision of his car with another. Mr. Evans might have lived for years, in the absence of the sudden and violent strain which he underwent in moving his automobile. The strain was the cause of Evans' death, just as fright was the cause of Mr. Pierce's sudden cerebral hemorrhage. Judge Steinert said, in the *Pierce* case:

"The general rule adopted by the majority of the courts in such cases, is that the direct and proximate cause is that which sets in motion a train of events which brings about a result without the intervention of any force operating or working actively from a new and independent source. *Hanley v. Occidental Life Ins. Co.*, 164 Wash. 320, 326, 2 P. (2d) 636; 6 Couch, Cyclopedia of Insurance Law, 5311, § 1471.

"The statement of the general rule, however, simple as it may at first seem to be, does not fully solve the difficulty inhering in many complex situations. It is easy to give a definition of 'proximate cause,' but it is not so easy, at times, to determine the particular factor which precisely meets the requirements of the definition. In short, the difficulty is always that of applying the definition to a given state of facts, that is, to determine what *was* the thing that set in motion a train of events which brought about a certain result, and whether or not other factors were intervening forces 'operating or working actively from a new and independent source.'

"Confining ourselves to that branch of the law involving accident insurance policies, we have an expression by this court as to the proper test of causation. In the *Hanley* case, *supra*, we quoted with approval the following statement from *Driskell v. U. S. Health & Accident Ins. Co.*, 117 Mo. App. 362, 93 S. W. 880, wherein the analogous provision in the policy was 'if death should result solely from such injuries':

" ' " 'We think the only reasonable interpretation to be placed upon this clause is to say that the injury must stand out as the predominant factor in the production of result and not that it must have been so virulent in character as necessarily and inevitably to have produced that result regardless of all other conditions and circumstances. People differ so widely in health, vitality and ability to resist disease and injury, that what may mean death to one man would be comparatively harmless to another and, therefore, the fact that a given injury may not be generally lethal does not prevent it from becoming so under certain conditions; and if, under the peculiar temperament or condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condi-

tion to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury.' " '

"The concluding sentence of the paragraph just quoted seems to us to furnish the answer to the particular question in this case. The appellant may have had a diseased condition which deprived him of the normal power of resistance to the effects of undue strain or fright, and it may have been a necessary condition to the result, but his physical condition did not necessarily deprive the strain or fright of its character as the predominant factor in the production of the result. In other words, appellant's prior state of health was but a condition, and not a concurring cause."

Under the strict rule suggested by the majority, any physical difficulty, grave or slight, might well be brought within the prohibitive provisions of the accident policy. Not one member of the human family out of ten thousand is a perfect physical specimen. Latent and incipient tuberculosis, heart derangement, diabetes, cancer, and a multitude of other diseases beset the human system. Any one of them *might* be said to be an "indirect contributing cause of death," when accompanied by sudden and unexpected fright or external strain or trauma. I do not believe that insurance companies should collect premiums upon "accident" policies and, at the same time, be permitted to defend against recovery upon such policies on the theory that the assured, at the time of his death, was afflicted with some hidden ailment or disease which, indirectly and remotely, contributed, with the immediate proximate cause, to his death.

Vital statistics on causes of death in the state of Washington sustain this observation. Judicial notice may be taken of the current report of the director of health for the state of Washington which supplies data on the ten major causes of death. We learn that 21,292 deaths occurred in the state during 1945; that, of this number, 31%, or 6,601, resulted from heart ailment, 12% from cancer, 9% from head injuries, 5% from kidney disorders, 3% from pneumonia, 3% from tuberculosis, 3% from automobile acci-

dents, 2% from diabetes, 2% from hardening of the arteries, and 1% from suicide. No expert mathematical training is necessary to bring one to a realization of the effect of the majority opinion upon holders of accident insurance policies who have the misfortune to be afflicted with a heart ailment or one of the major causes of death.

Strict construction of the policy against the insured might warrant such a rule as has been announced by the majority. Liberal construction in favor of the insured will never countenance it. The rule of law laid down by this court, construing this type of policy, was clearly announced in the *Pierce* case, *supra*. The effect of the majority opinion is to completely reverse that decision without expressly so ruling. I cannot concur in this.

MILLARD, C. J., concurs with CONNELLY, J.

December 27, 1946.   Petition for rehearing denied.