[No. 30876. *En Banc.* December 15, 1949.]

MARION E. BENNETT, *Appellant,* v. METROPOLITAN LIFE INSURANCE COMPANY, *Respondent.*[1]

[1] Reported in 212 P. (2d) 790.

*Koenigsberg & Oseran,* for appellant.

*Preston, Thorgrimson & Horowitz,* for respondent.

ROBINSON, J.—This is an action on an insurance policy providing for payment of double indemnity to the beneficiary if the insured should meet his death through accidental means. The pertinent provision of the policy provides as follows:

"Accidental Means Death Benefit—The Company promises to pay to the Beneficiary under this Policy, in addition to the amount otherwise payable according to the terms of this Policy, an additional sum equal to the Initial Amount of Insurance shown on page 1, upon receipt at the Home Office of due proof of the death of the Insured, while this provision is in effect, as the result, directly and independently of all other causes, of bodily injuries caused *solely* by external, violent, and accidental means, and that such death shall not have occurred (a) more than 90 days after the date of such injuries, or (b) as the result of *or by the contribution of disease or bodily or mental infirmity* or medical or surgical treatment therefor or infection of any nature unless such infection is incurred through an external visible wound sustained through violent and accidental means, . . ." (Italics ours.)

The plaintiff and appellant in this action is Marion E. Bennett, the beneficiary named by the insured, Elmer T. Bennett. She has been paid the initial amount on the policy, but the respondent, insurance company, has declined to pay the double indemnity, on the ground, as it alleges, that the insured's death was not, as the appellant claims, caused by

accident alone, but was contributed to by epilepsy and tuberculosis, from both of which he was suffering at the time of his death.

The cause was tried to a jury in the superior court of King county. After plaintiff had rested, defendant challenged the sufficiency of the evidence to sustain a verdict in plaintiff's favor, and moved to dismiss with prejudice. This motion was granted, and it is from the judgment of dismissal that this appeal is prosecuted.

In construing clauses of this type, we have held that it is incumbent upon a beneficiary to show that death of the insured was caused solely by accidental means. *Evans v. Metropolitan Life Ins. Co.*, 26 Wn. (2d) 594, 174 P. (2d) 961.

If there is doubt as to whether death resulted from disease or accident, that doubt must be resolved by the jury. *Towey v. New York Life Ins. Co.*, 27 Wn. (2d) 829, 180 P. (2d) 815. It follows that a jury question will be similarly presented if there be uncertainty as to whether a given disease, with which the insured was admittedly afflicted, was a contributing cause, or merely a condition of his death. See *Graham v. Police & Firemen's Ins. Ass'n.*, 10 Wn. (2d) 288, 116 P. (2d) 352. With these principles in mind, we turn to the facts of the instant case.

The insured was a man thirty-nine years of age, was obese in build, and for some years had suffered from epileptic attacks. From December of 1944, he was unable to work. In the spring of 1946, he was taken to Harborview Hospital, and on June 4, 1946, was transferred to the Western State Hospital. Here, an examination revealed a certain mental deterioration, which, it was felt, was the result of his chronic epileptic condition; and furthermore, X rays of his lungs indicated, in the words of his doctor, "a nonspecific pulmonary lesion to be considered as possibly tuberculosis."

During his stay in the hospital, the insured was allowed to be up and about the ward, although he was quite feeble in his manner of getting around. On July 14th, while he was being helped to the bathroom, the following, again in the words of his doctor, occurred:

"A. On the afternoon of the 14th, a little after three o'clock, this patient was going down the hall and part of the way was in the company of another person and he stumbled as he went into the door to the bathroom on a small rug and fell and at that time injured his hip, his right hip, which was determined by an X ray on the next morning. . . . The X ray disclosed a fracture or a break across the main part of the hip . . . "

Treatment proceeded as follows:

"A. He was immobilized, which means he was made to lie still, which is hard for some people. He was put in extension, which means that there was attached to his leg some adhesive straps and other devices to allow the attachment of a weight at the foot of the bed, and that weight, pulling on the end of his right leg in such extension, was attached."

From this time on, the patient was continuously in bed until his death. Subsequent examinations indicated that the bone was healing well, but that signs of epileptic deterioration were still present. The tubercular condition, however, progressed to the point where it was declared to be active and moderately advanced. Isolation was recommended, as soon as it should become physically possible to place him in a tuberculosis ward.

Both doctors called by the appellant testified that the immobilization of the patient had had a bad influence on his physical condition. An examination made early in the morning of September 20th disclosed symptoms which indicated that he was suffering from edema of the lungs, edema being defined by one of the doctors as an accumulation of water in the tissues likely to result from immobilization, particularly immobilization of an obese individual. That same morning the patient died.

Dr. Barber, the attending physician, in executing the death certificate, which was introduced in evidence, gave the cause of death as follows:

"Immediate cause of death: Pulmonary tuberculosis, also exhaustion from epileptic psychosis.
"Other conditions: Fracture, Rt. hip."

He testified, on cross-examination, as follows:

"Q. Isn't it your opinion that he died of tuberculosis? A. No, sir. I think that the tuberculosis was an inter current or an additional factor present. It is one of the causes. I'll phrase it that way. Q. It is one of the causes? A. Yes, sir. Q. And the epilepsy another cause? A. Yes, sir. Q. The broken hip another cause? A. The broken hip another cause. Q. Three causes? A. That is right; the broken hip rendering the man helpless. . . . Q. All those contributed to each other? A. I think so."

And later, again on cross-examination:

"Q. What is exhaustion from epileptic psychosis? A. Exhaustion would be a condition in which the frequency of convulsive attacks or the duration of these other conditions would have been going on for such a length of time that the individual has lost his normal grasp, his normal physical strength and has come to a rather critical state in his life. Q. Exhaustion from epileptic psychosis was one of the causes of this man's death, was it not? A. That is right. Q. That was a definitely contributing cause? A. Yes, a cause that was contributing at that time."

The other doctor who testified in the case, Dr. Williams, did not see the patient either before or after his death. He testified that, "I think his accident of July 14th, 1946 resulted in his death. . . . I'd think that the most reasonable assumption or cause of death was edema of the lungs." On cross-examination, however, he testified as follows:

"Q. Just so I understand you, Doctor, you say in your opinion the man did not die of pulmonary tuberculosis? A. No. In my opinion he did not die of pulmonary tuberculosis. Q. Is it your opinion that pulmonary tuberculosis contributed to his death? A. In my opinion— Q. You can answer that yes or no. MR. KOENIGSBERG: Now, — A. Beg your pardon? Q. You can answer that yes or no. Did it contribute to his death? A. Yes. Q. Is it your opinion that this epileptic psychosis contributed to his death? A. Yes. Q. Is it your opinion that the accident that he had aggravated the pulmonary tuberculosis and the epileptic psychosis? A. No. Q. (Mr. Preston) You don't think that had any effect on it? A. No. Q. But that you do feel that both—that—rather that the pulmonary tuberculosis con-

tributed to cause his death? THE COURT: That is repetitious. Q. Definitely, you are definite in that? A. Yes."

It is suggested that the technique employed on this cross-examination forced the doctor to say what he did not really mean; but when, immediately following the quoted testimony, he was given an opportunity to qualify it on redirect examination, he testified as follows:

"By MR. KOENIGSBERG: Q. Now, Doctor, the question was first asked of you as to whether or not he died of tuberculosis, and your answer was in the negative in your opinion, and then the question was asked whether or not in your opinion tuberculosis contributed to the death, and your answer was in the affirmative. Now, will you explain that to the jury? A. A man who was injured in this occasion, the fall of July 14th, 1946, *was at the time of the fall an epileptic and tuberculous* and had sustained a severe injury to his low back which made it difficult for him to walk of itself. In other words, that is, the individual was—who was injured, the fall necessitated his immobilization. There is no indication and it isn't likely that the fall caused any increase or spread or reactivation of his pulmonary tuberculosis; rather, *the existence of the tuberculosis would make it much easier for him with immobilization to develop edema of the lungs than it would if he had no previous inflammatory condition in the lungs.*" (Italics ours.)

Dr. Williams then testified that, in his opinion, the tuberculosis and the condition of epilepsy present were not "lethal" without the fall. However, although he stated that, even had the patient been perfectly healthy, there would have been some risk in putting him to bed and immobilizing him, he at no time suggested that the patient would have died from the fall and the effects of the resulting immobilization, even had he not been suffering from tuberculosis and epilepsy. All of his testimony quoted above appears to point toward a contrary conclusion.

To refer again to the explicit terms of the policy: It requires that, in order to render the beneficiary eligible for the double indemnity payment, the insured must have died

". . . as the result, directly and independently of all other causes, of bodily injuries caused *solely* by external, violent, and accidental means,"

and further provides that such death shall not have occurred "by the contribution of disease or bodily or mental infirmity." The doctors appear to have disagreed as to the comparative weight to be accorded the various factors alleged to have caused the death of the insured; but, certainly, nothing in the testimony of Dr. Barber, and, in our opinion, nothing in the testimony of Dr. Williams, left room for the jury to conclude that the death of the insured could have been caused *solely* by external, violent, and accidental means.

When all of the testimony is considered together, the conclusion seems inescapable that the death occurred by the contribution of both the tuberculosis and the epileptic condition with which the insured was afflicted. And, as we said in *Towey v. New York Life Ins. Co., supra:*

"We cannot make contracts for people. If they agree with an insurance company that it will pay double indemnity only upon certain stipulated contingencies, their beneficiaries are bound by such agreements." (p. 840)

Counsel for appellant argue that, if the position of the trial court should be sustained, the cases where insurance companies will be required to pay under the double indemnity provisions of their policies will be very few, particularly where it can be shown that the insured had previously contracted some disease. But we may point out that we are not dealing in this case with an instance where the disease, alleged to be a contributing factor in the death of the insured, was substantially cured, or was latent or dormant, or did not interfere with the performance of the daily work of the insured. Here, the insured was in a condition to be hospitalized, either for tuberculosis or by reason of his epileptic condition. Nor, as we have noted, are we dealing with an accident so severe that it would in all probability have resulted in death, even had the insured been perfectly well.

Where there is any doubt as to whether disease was a contributing cause of death in a given case, our decisions have consistently held that only the jury may resolve that

doubt. But from the testimony here presented, considered in the light most favorable to appellant, we are unable to find any such doubt.

We are, therefore, of the opinion that the insurance company should not be required to pay under the double indemnity provision of the policy, and that the trial court was justified in taking the matter from the jury and dismissing the case.

The judgment is affirmed.

SIMPSON, C. J., BEALS, GRADY, HAMLEY, and DONWORTH, JJ., concur.

SCHWELLENBACH, J., concurs in the result.

HILL and MALLERY, JJ. (dissenting)—We dissent. Under the rule announced in *Graham v. Police & Firemen's Ins. Ass'n,* 10 Wn. (2d) 288, 116 P. (2d) 352, it was a jury question whether the epilepsy and tuberculosis constituted a contributing cause or merely a condition of Mr. Bennett's death.